UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PAMELA JOHNSON,

    Plaintiff,

    v.

DONG MOON JOO, THE WASHINGTON
TIMES CORP., and NEWS WORLD
COMMUNICATIONS, INC.,

    Defendants.

Civil Action No. 01-0004  (CKK)

**MEMORANDUM OPINION**
(March 12, 2006)

Plaintiff, a former employee in The Washington Times' Department of Human Resources,
brings the above-captioned action against Defendant News World Communications, Inc.
("Defendant"),[1] pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, as
amended ("Title VII"), alleging, *inter alia*, that she was subjected to (1) discrimination based on her
race, African-American, and her religion, on the basis that she was not a member of the Holy Spirit
Association for the Unification of World Christianity ("The Unification Church"); and (2)
retaliation for her prior use of the Equal Employment Opportunity ("EEO") process. *See generally*
Compl.  Plaintiff's action centers around two events:  (1) the March 1998 decision by Defendant to
provide her with a raise of only 3%, which she contends was insufficient when compared to her
similarly-situated co-workers; and (2) the October 1998 decision by Defendant to terminate
Plaintiff's employment due to numerous alleged breaches of confidentiality and failure to cooperate

---

[1] Pursuant to Federal Rule of Civil Procedure 41(a), Plaintiff stipulated to the dismissal with
prejudice of Defendants Dong Moo Joo and The Washington Times Corporation on October 4,
2004.  *See* 10/4/04 Written Stipulation of Dismissal at 1 (Docket Entry #113).  Accordingly, News
World Communications, Inc., is the only remaining defendant in this action.

in the ensuing investigation – justifications that she contends are a pretext for invidious discrimination.  In response, Defendant asserts that it has articulated legitimate, non-discriminatory reasons for its decisions, and Plaintiff has failed to adduce evidence indicating that the stated reasons are merely a pretext for discrimination.

Currently before the Court are Defendant's Motion for Summary Judgment, Plaintiff's Opposition, and Defendant's Response.  Upon a searching examination of the parties' filings, the attached exhibits, the relevant case law, and the entire record herein, the Court shall grant Defendant's Motion for Summary Judgment.

## I: BACKGROUND

### A.     Johnson is Hired by The Washington Times

Defendant News World Communications, Inc., has operated and published The Washington Times newspaper since 1982.  *See* Def.'s Mot. for Summ. J., Ex. 1 (Borer Aff.) ¶ 4.  News World Communications and The Washington Times have some connection to The Unification Church; for instance, the founder of the Washington Times, the Reverend Dr. Sun Myung Moon, is also the spiritual leader of the Unification Church, while the current President of News World Communications, Dong Moon Joo, is a longtime member of The Unification Church.  *See* Pl.'s Opp'n, Ex. 3 (7/10/01 Borer Dep.) at 93:15-94:19; *id.*, Ex. 8 (9/26/01 Joo Dep.) at 4:17-6:10, 78:5-78:11.  Moreover, Unification Church documents identify The Washington Times as a "Department" of The Unification Church, and recognize News World Communications' Chief Operating Officer, Keith Cooperrider, as a "Contact Person."  *See id.*, Ex. 21 (Unification Church Departments/Contact Persons Document); *id.*, Ex. 4 (9/26/01 Edwards Dep.) at 15:2-3.  However, while The Washington Times has some ties to The Unification Church, only approximately 17% of News World Communications employees were members of The Unification Church during the time

2

period relevant to this suit – October 1998.  *See* Pl.'s Opp'n, Ex. 19 (Spreadsheet Based on 10/1998

Staff Directory) (based on member lists and testimony, estimating that 110 of the 645 News World

Communications employees listed in the staff directory were members of The Unification Church).

Plaintiff Pamela T. Johnson, née Pamela L. Tippins, is an African-American female who is

not and has never been a member of The Unification Church.  *See* Pl.'s Opp'n, Ex. 1 (Johnson Aff.)

¶¶ 3-4; *id.*, Ex. 62 (Pl.'s 4/24/98 EEOC Charge) ¶ III (identifying herself as a Protestant); *id.*, Ex.

63 (Pl.'s 11/17/98 Amended EEOC Charge) ¶ III.  Plaintiff submitted an Application for

Employment to Defendant in July 1989, seeking a "Personnel Assistant" position with The

Washington Times.  *See* Def.'s Stmt. of Mat. Facts Not in Dispute ("Def.'s Stmt.") ¶ 1; Pl.'s Stmt.

of Mat. Facts in Dispute Revised Per the Court's July 11, 2005 Order ("Pl.'s Resp.") ¶ 1.[2]  In the

---

[2] The Court begins its discussion of the facts by noting that this Court strictly adheres to the text of Local Civil Rule 56.1 (identical to Local Civil Rule 7.1(h)).  As such, in resolving the present summary judgment motions, this Court "assumes that facts identified by the moving party in the statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion."  LCvR 56.1.  The Court also cites directly to the record, where appropriate, to provide additional information not covered in either of the parties' statements.

Contrary to Local Civil Rule 56.1, Plaintiff, in initially responding to Defendants' Statement of Material Facts Not in Dispute, failed to provide "a separate *concise* statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated."  LCvR 56.1 (emphasis added).  Rather than admitting, denying, or denying-in-part/ admitting-in-part each statement set out by Defendant in corresponding numbered paragraphs and supporting each response through citations to the record, as required by Local Civil Rule 56.1 and this Court's July 24, 2004 Scheduling and Procedures Order, Plaintiff's initial Statement (1) peppered her filing with argument, speculation, conjecture, and assumptions that – while possibly proper in her accompanying Opposition – were not proper in the context of Plaintiff's Response to Defendant's Statement; and (2) frequently provided responses to Defendant's Statement that were entirely devoid of direct citations to the evidence adduced during discovery.  Accordingly, through a July 11, 2005 Minute Order, the Court granted-in-part Defendant's Motion to Strike, and gave Plaintiff leave to re-file a new Statement of Material Facts and Opposition to Defendant's Motion for Summary Judgment.  *See Johnson v. Joo*, Civ. No. 01-0004 (D.D.C. July 11, 2005) (Minute Order striking Plaintiff's Statement of Material Facts but denying Defendant's motion to deem all facts admitted).

On September 30, 2005, Plaintiff submitted a new Opposition and accompanying Statement

"Special Skills and Qualifications" portion of her Application for Employment, Plaintiff noted that

she has "an absolute understanding of confidentiality requirements imposed by statutory and

regulatory constraints."  Def.'s Stmt. ¶¶ 2-3; Pl.'s Resp. ¶¶ 2-3.  Plaintiff listed confidentiality as a

"special skill and qualification" on her application because she recognized the importance of

confidentiality in a company's Department of Human Resources.  Def.'s Stmt. ¶ 4; Pl.'s Resp. ¶ 4.

Following an interview process, Plaintiff was hired as a Personnel Assistant in the Human Resources

Department of The Washington Times effective August 23, 1989.  Def.'s Stmt. ¶ 5; Pl.'s Resp. ¶ 5.

On Plaintiff's "Confidential Employee History" maintained by Defendant, "confidentiality" is listed

as one of Plaintiff's "special skills or training" valued by the company.  Def.'s Stmt. ¶ 6; Pl.'s Resp.

---

of Material Facts in Dispute, which represents a substantial improvement over the previous
Statement.  However, taking issue with certain responses, Defendant filed another Motion to Strike
on October 14, 2005, to which Plaintiff has filed an Opposition, and Defendant has filed a Reply.
Specifically, Defendant takes issue with Plaintiff's Responses ¶¶ 60, 73, 138, 139, 141-144, 146,
147, 150-155, 157-163, 165, 166, 181, 182, 184, 186, 187, 190, 192-198, and 203-205.  *See* Pl.'s
Second Mot. to Strike at 5.  In response to these specific Statements, which revolve around the
testimony of James A. Borer, Plaintiff contends that the Supreme Court's decision in *Reeves v.
Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000),
forecloses the Court from considering or crediting the testimony of "an interested witness" at the
summary judgment stage of an employment discrimination dispute.  *See, e.g.*, Pl.'s Resp. ¶ 60.

    As has been held by other Circuits, Plaintiff is guilty of "over-reading" *Reeves*.  *See, e.g.*,
*Almond v. ABB Indus. Sys., Inc.*, 56 Fed. Appx. 672, 675 (6th Cir. 2003) ("this interpretation of the
summary judgment standard both over-reads *Reeves* and leads to absurd consequences"); *Traylor v.
Brown*, 295 F.3d 783, 791 (7th Cir. 2002) ("consistent with plaintiff's ultimate burden of proof
under *McDonnell Douglas*, a plaintiff cannot avoid summary judgment by merely claiming a jury
could disbelieve the employer's reason"); *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 898
(5th Cir. 2002) (noting that this erroneous interpretation would essentially eliminate the plaintiff's
burden to show that an employer's explanation is pretextual).  While these responses provided by
Plaintiff are ill-advised and the purpose of Rule 56.1 was to "place the burden on the parties and
their counsel, who are most familiar with the litigation and the record, to crystallize for the district
court the material facts and relevant portions of the record," *Finnegan*, 101 F.3d at 151, the Court
shall not strike Plaintiff's new Statement.  Rather, the Court shall work around any issues by
carefully parsing the record and both sets of "Material Facts Not in Dispute" and citing directly to
the record whenever necessary during its outlining of the background of this dispute.  Accordingly,
the Court shall deny Defendant's Second Motion to Strike.

¶ 6.

      B.     *The Scope and Attendant Obligations of Plaintiff's Employment*

Less than one (1) month after her employment began with The Washington Times, Plaintiff received the company's "Employee Handbook." Def.'s Stmt. ¶ 7; Pl.'s Resp. ¶ 7. As specified in the "Acknowledgment" that she signed upon receiving the Handbook, Plaintiff agreed to become familiar with the contents of the Handbook, and understood that she had a right and the ability to ask her supervisor or a representative of the Human Resources Department for further information on any subject in the Handbook. Def.'s Stmt. ¶ 8; Pl.'s Resp. ¶ 8. While employed at The Washington Times, Plaintiff was familiar with the Handbook and knew that she was to conduct herself consistent with the Handbook. Def.'s Stmt. ¶ 9; Pl.'s Resp. ¶ 9. Through the Handbook and the knowledge she gained while serving in The Washington Times' Human Resources Department, Plaintiff was aware that the company had a policy against discrimination on any basis, including race, religion, gender, or otherwise, and was familiar with the grievance/complaint procedure described in the Handbook. Def.'s Stmt. ¶¶ 10-11; Pl.'s Resp. ¶¶ 10-11. Indeed, Plaintiff – as part of her responsibilities in the Human Resources Department – participated in instructing employees to submit grievances if they believed they were subject to any type of discrimination. Def.'s Stmt. ¶ 12; Pl.'s Resp. ¶ 12. During Plaintiff's time at The Washington Times, one of her Department's responsibilities was to ensure that there was no discrimination at the newspaper, and the offices themselves contained posters describing applicable EEOC policies. Def.'s Stmt. ¶¶ 13-14; Pl.'s Resp. ¶¶ 13-14. Plaintiff was aware that the Human Resources Department would conduct an investigation of a complaint of discrimination, and others within her Department believed that complaints of discrimination were taken seriously, looked into, and investigated thoroughly. Def.'s Stmt. ¶¶ 15-16; Pl.'s Resp. ¶¶ 15-16.

In the Human Resources Department, Plaintiff's obligations included, *inter alia*, confidentiality, candor, and cooperation. Confidentiality was seen as a critical obligation, as many of the documents located within the department constituted "confidential personnel information." Def.'s Stmt. ¶¶ 32 35; Pl.'s Resp. ¶¶ 32, 35. Employees such as Plaintiff within the Human Resources Department had a duty to maintain the confidentiality of confidential Human Resources Department records. Def.'s Stmt. ¶¶ 33, 38 (Plaintiff agrees that having access to confidential documents and information is a position of trust); Pl.'s Resp. ¶¶ 33, 38. Employees within the Human Resources Department, including Plaintiff, were not authorized to mail out or otherwise distribute personnel records unless authorized by the Director of the Human Resources Department. Def.'s Stmt. ¶ 34; Pl.'s Resp. ¶ 34. One of Plaintiff's duties included maintaining the confidentiality of the Human Resources Department. Def.'s Mot. for Summ. J., Ex. 3 (6/25/01 Johnson Dep.) at 256:12-21. Of all the actions that a Human Resources Department employee could do that would result in discipline, violation of the obligation of confidentiality was considered to be the most reprehensible; if an employee in the Department gave someone outside of the Department confidential documents or otherwise breached confidentiality, that employee had committed an offense meriting termination. Def.'s Stmt. ¶¶ 37, 39, 46-47 (in her handwritten notes as part of the orientation process, Plaintiff noted that disclosure of confidential information would lead to discharge); Pl.'s Resp. ¶¶ 37, 39, 46-47. Indeed, Plaintiff herself testified that she had no doubt that breach of The Washington Times' confidentiality provisions or her violation of confidentiality could lead to the termination of her employment with the company. Def.'s Stmt. ¶ 40; Pl.'s Resp. ¶ 40.

With respect to candor and cooperation, The Washington Times had the right to expect that Plaintiff, in her positions with the Human Resources Department, would provide accurate information to it about any personnel issue or investigation about which it inquired. Def.'s Stmt. ¶

41; Pl.'s Resp. ¶ 41.  As part of her personnel functions, Plaintiff provided employment verifications periodically to requesting banks, mortgage companies, and others.  Def.'s Stmt. ¶ 42; Pl.'s Resp. ¶ 42.  In issuing such verifications, Plaintiff was aware that accuracy was essential and that only correct information should be provided.  Def.'s Stmt. ¶ 43; Pl.'s Resp. ¶ 43.  Similar to a breach of confidentiality, Plaintiff was aware that if an employee in the Human Resources intentionally provided inaccurate information in an employment verification, that action constituted grounds for discipline, including termination.  Def.'s Stmt. ¶ 44; Pl.'s Resp. ¶44.

      C.     *Plaintiff's Positions, Duties, and Raises at The Washington Times*

Plaintiff progressed through the ranks of The Washington Times' Human Resources Department, with her title changing from "Personnel Assistant" to "Records Assistant" as of January 1990, to "Human Resources Assistant" as of August 19, 1991, and to "Human Resources Information System Specialist" ("HRIS Specialist") as of September 30, 1991.  Def.'s Stmt. ¶ 17; Pl.'s Resp. ¶ 17.  In November 1997, at the request of her supervisor James A. Borer, Plaintiff prepared an updated job description of the HRIS Specialist position, and again noted that the "major responsibilities" of the position included "maintain[ing] confidential status of all company information."  Def.'s Stmt. ¶¶ 18-19; Pl.'s Resp. ¶¶ 18-19.  Plaintiff remained an HRIS Specialist at The Washington Times until October 29, 1998, when she was terminated by Borer and her employment at the newspaper ended.  Def.'s Stmt. ¶ 20; Pl.'s Resp. ¶ 20.

Upon the commencement of her employment with The Washington Times in August 1989, Plaintiff was paid $8.66 per hour.  Def.'s Stmt. ¶ 21; Pl.'s Resp. ¶ 21.  However, Plaintiff was given numerous raises during her eight-year tenure with the newspaper:

| Date | New Rate | Percentage Increase |
|------|----------|---------------------|
| August 23, 1989 | $8.66/hour | -------------------------------------- |
| January 15, 1990 | $9.62/hour | 11.08% |
| January 15, 1991 | $10.00/hour | 3.95% |
| August 19, 1991 | $461.54/week | 15.39% |
| November 1, 1992 | $507.70/week | 10.00% |
| August 19, 1993 | $527.28/week | 3.85% |
| August 23, 1994 | $543.10/week | 3.00% |
| August 19, 1995 | $553.96/week | 2.03% |
| August 19, 1996 | $570.58/week | 3.00% |
| August 19, 1997 | $587.70/week | 3.02% |
| February 27, 1998 | $14.70/hour | -------------------------------------- |
| March 23, 1998 | $15.14/hour | 3.05% |

*See* Def.'s Stmt. ¶ 22; Pl.'s Resp. ¶ 22 (making some corrections that the Court has used).  During

the course of her employment, Plaintiff's salary increased by 74.8% (not adjusted for inflation).

Def.'s Stmt. ¶ 23; Pl.'s Resp. ¶ 23.

> D.     *The Human Resources Department and Other Employees*

Geoffrey Edwards was the General Manager of The Washington Times from October 1994

until the end of 1999/early 2000.  Def.'s Stmt. ¶ 48; Pl.'s Resp. ¶ 48 (not contesting that this was

Edwards' undisputed testimony).  Edwards had experience running newspapers from 1965 to 1999,

and ran all aspects of the newspaper except the editorial and financial parts of the paper.  Def.'s

Stmt. ¶¶ 49-50; Pl.'s Resp. ¶¶ 49-50 (not contesting that this was Edwards' undisputed testimony).

Edwards was not – and has never been – a member of The Unification Church.  Def.'s Stmt. ¶ 51;

Pl.'s Resp. ¶ 51.  Ronald Clarke was the Manager of Safety, Security, and Workers Compensation

at The Washington Times from 1989 until after 1998.  Def.'s Stmt. ¶ 58; Pl.'s Resp. ¶ 58.  Clarke

was responsible for managing the Security Department, among other things.  Def.'s Stmt. ¶ 59; Pl.'s

Resp. ¶ 59.  Clarke testified that he was not – and has never been – a member of The Unification

Church.  Def.'s Mot. for Summ. J., Ex. 14 (7/12/01 Clarke Dep.) at 138-39.

By late 1996, The Washington Times' Human Resources Department consisted of John

Martin, who was then Legal Counsel and Director of the Human Resources Department; James

Borer, who was Deputy Legal Counsel and Martin's Assistant; Plaintiff, who was the HRIS

Specialist; Sherrie D. Palmer, who was then the Employment Specialist; Les Reddin, who was the

Benefits Specialist; and Sheletha Howard, who was the Secretary.  Def.'s Stmt. ¶ 52; Pl.'s Resp. ¶

52 (agreeing on the listing of personnel and their job titles).  Martin is a white male who is not

apparently a member of The Unification Church;[3] Borer is a white male who has testified that he is a

member of both the Catholic Church and The Unification Church; Palmer is an African-American

female who is not a member of The Unification Church; Reddin is a white male who testified that he

is a member of The Unification Church; and Howard is an African-American female who is not a

member of The Unification Church.  Id.[4]  Plaintiff was and remains friends with Palmer.  Def.'s

---

[3] Borer has stated that he did not believe that Martin was a member of The Unification Church, see Def.'s Mot. for Summ. J., Ex. 1 (Borer Aff.) ¶ 11, and Plaintiff has introduced no evidence suggesting that Martin was a member.  A review of The Unification Church membership lists attached by Plaintiff shows that these lists do not contain Martin.  See Pl.'s Opp'n, Exs. 19-23. Accordingly, the only evidence in the record indicates that Martin was not a Unification Church member.

[4] According to Borer, Defendant neither obtained any information from employees about their religious affiliation, membership, or beliefs, if any, nor did it maintain any records reflecting such information.  See Def.'s Mot. for Summ. J., Ex. 1 (Borer Aff.) ¶ 10.  According to Defendant, the information as to religious affiliation and/or membership described above is based on the testimony elicited during depositions taken by Plaintiff of individual employees of which Plaintiff inquired as to that employee's religious affiliation.  Id.  Plaintiff does not dispute Defendant's contention that it did not maintain such records.  See Pl.'s Resp. ¶ 52.  However, Plaintiff contends

Stmt. ¶ 57; Pl.'s Resp. ¶ 57.

    E.    *Changes Within the Human Resources Department and the Struggle for Raises*

    In the Fall of 1996, Ms. Howard – the Human Resources Department's secretary – left her

job on an emergency, unexpected basis.  Def.'s Stmt. ¶ 61; Pl.'s Resp. ¶ 61.  Initially, Howard was

out on a leave of absence; however, her employment with The Washington Times was terminated in

January 1997 as a result of her absence without explanation for three (3) consecutive days after she

was to have returned.  Def.'s Mot. for Summ. J., Ex. 3 (6/25/01 Johnson Dep.) at 122:13-123:2.

Following her termination, Howard filed a lawsuit alleging wrongful discrimination with the District

of Columbia Office of Human Rights in 1997.  Def.'s Stmt. ¶ 66; Pl.'s Resp. ¶ 66.  That same year,

1997, John Martin, who had been Legal Counsel and Director of Human Resources at The

Washington Times, left the newspaper to pursue other opportunities.  Def.'s Mot. for Summ. J., Ex.

1 (Borer Aff.) ¶ 2.  James A. Borer, formerly Deputy Legal Counsel and Martin's Assistant,

succeeded Martin and became the company's Legal Counsel and Director of Human Resources.  *Id.*

    By 1998, the other members of The Washington Times' Department of Human Resources –

Reddin, Palmer, and Plaintiff – began indicating dissatisfaction with their salaries and requesting

corresponding raises.  Beginning in January 1998, Reddin began threatening resignation, contending

that "[t]he Employment Specialist position [Palmer's position] has been reduced to a mere clerical

job" while his position as Benefits Specialist "has been increased from clerical to managerial

without any corresponding increase in compensation to make the increased aggravation attractive to

_____

that Defendant – or, at the very least, Borer – knew that Reddin was a member of The Unification
Church and would have known by the date of Plaintiff's April 1998 EEOC Charge that she was not
a member.  *Id.*  Plaintiff also contends that Borer could have located such information with ease,
given that he maintained a Unification Church membership directory in his home and attended
church regularly.  *Id.*

endure." Def.'s Mot. for Summ. J., Ex. 15 (1/19/98 Reddin Memo to Dong Moon Joo) at 1.  In

three separate "memos," Reddin set forth his view that he was underpaid based on his duties and

responsibilities, and that he should be paid more based on what he believed to be the market for

employees similarly-situated with corresponding duties and responsibilities.  *See id.*, Ex. 15

(1/19/98 Reddin Memo to Dong Moon Joo); *id.*, Ex. 16 (2/12/98 Reddin Memo to Edwards); *id.*,

Ex. 17 (3/4/98 Reddin Memo to Dong Moon Joo) (announcing resignation effective 3/18/98).  On

January 16, 1998, Reddin prepared and submitted an extensive, highly detailed "Job Description"

setting forth that which he considered to be the duties and responsibilities of the Benefits Specialist.

*See* Pl.'s Resp. ¶ 70 (contending that "Defendant provides no record evidence that the attached Job

Description was prepared by Mr. Reddin . . . ."); *but see* Def.'s Mot. for Summ. J., Ex. 18 (1/16/98

Reddin Job Description) ("Prepared by: Les Don Reddin"); *id.*, Ex. 1 (Borer Aff.) ¶ 12 ("That

which is attached hereto to [sic] the Statement as Exhibit 18 is a true and accurate copy of a

proposed job description submitted by Les Reddin to me in response to my request that he prepare

and provide such a job description.").

     In these documents, Reddin claimed responsibility for, among other things, benefit plans

pertaining to sick schemes, cafeteria schemes, pension plans, and 401(k) plans.  Def.'s Stmt. ¶ 71;

Pl.'s Resp. ¶ 71 (citing Plaintiff's deposition testimony indicating that she would often answer

employee questions about these areas because the Department was short of staffing).  Reddin also

noted that he was the Benefit Specialist responsible for administering a budget for benefits of

roughly $3 million.  Def.'s Stmt. ¶ 72; Pl.'s Resp. ¶ 72 (noting again Plaintiff's role).  General

Manager Edwards reviewed Reddin's arguments for a raise and, based on Reddin's duties and

responsibilities, came to the conclusion that Reddin's salary should be increased.  *See* Def.'s Mot.

for Summ. J., Ex. 12 (9/26/01 Edwards Dep.) at 34:10-18, 35:3-10.  Edwards relayed this

conclusion to the President of The Washington Times, Dong Moon Joo, and convinced Joo of the

merits of Reddin's request. *Id.* at 34:34:10-35:2. Borer also reviewed Reddin's request, and

concluded that Reddin's "responsibilities seemed quite large to me. And he seemed to be handling

them well." *Id.*, Ex. 9 (7/10/01 Borer Dep.) at 227:5-7. As such, he requested that Palmer, in her

capacity as Employment Specialist, provide him with a compensation survey. *Id.* at 227:7-13.

Palmer eventually provided Borer with such a survey, though the information provided was put out

by the Washington Personnel Association and was several years old at the time. *Id.* at 227:14-

228:4. Upon "looking at [Reddin's] duties and tasks and responsibilities and consulting with the

employment specialist and the survey," Borer also recommended that Reddin receive a raise. *Id.* at

227:9-13.

Reddin's salary request was partially met with a raise in early February 1998; however, the

raise fell below Reddin's expectations and he again threatened resignation. *See id.*, Ex. 16 (2/12/98

Reddin Memo to Edwards). In response to this second request for a raise, Edwards agreed with

Reddin's request, *id.*, Ex. 12 (9/26/01 Edwards Dep.) at 45:14-15 (Edwards recalls his support for

Reddin's second request, but notes that he cannot remember if he spoke to Joo regarding this

request). Edwards determined an appropriate additional raise for Reddin based on his "experience

of what other people were making" "in The Washington Times" who were "in responsible

administrative positions." *Id.* at 47:11-23. Ultimately, Reddin's second request was granted as

well, and – through his two 1998 raises – his salary was increased from $29,790, *see id.*, Ex. 15

(1/19/98 Reddin Memo to Joo), to $38,500, Def.'s Stmt. ¶ 81; Pl.'s Resp. ¶ 81; *see also* Def.'s

Mot. for Summ. J., Ex. 22 (Personnel Action Form for Les Reddin) (noting new salary of $38,500

effective 3/23/98, which was a raise of $72.53/week, an 11% increase). During depositions in this

case, Plaintiff herself agreed that $38,500 was a fair salary for an employee, a Benefits Specialist

such as Reddin, who administered a multi-million dollar benefits program.  Def.'s Stmt. ¶ 82; Pl.'s

Resp. ¶ 82.

Following Reddin's raises, Plaintiff and Palmer submitted a joint Memorandum to Joo

requesting "Salary Adjustments."  Def.'s Stmt. ¶ 83; Pl.'s Resp. ¶ 83; Def.'s Mot. for Summ. J., Ex.

19 (3/12/98 Johnson & Palmer Memo to Joo).  Noting their increased responsibilities in the Human

Resources Department over the previous years, Plaintiff and Palmer noted:  "Our last hope is a

promotion or this raise; Employment Specialist $40,520.86 and HRIS Specialist $35,657.87, which

is well below market value of Employment Specialist $65,000 and HRIS Specialist $39,000 (1996

survey) for similar positions in similar size companies."  Def.'s Mot. for Summ. J., Ex. 19 (3/12/98

Johnson & Palmer Memo to Joo).  Joo responded to Plaintiff and Palmer through a Memorandum

dated March 17, 1998, in which he suggested that they address the issue with their supervision,

Borer, and with Edwards.  Def.'s Stmt. ¶¶ 84-85; Pl.'s Resp. ¶¶ 84-85.  Plaintiff and Palmer then

drafted a March 18, 1998 Memorandum to both Edwards and Borer regarding "Salary

Adjustments," in which they noted Joo's request to communicate with them and contended that, due

to their salary level, "[o]ur motivation has declined, especially since the cost of living is on the rise

and we are not making enough to cover the basics for our families."  Pl.'s Opp'n, Ex. 59 (3/18/98

Johnson & Palmer Memo to Edwards & Borer).  Throughout the years prior to this request, Plaintiff

had regularly received complimentary performance evaluations, and her most recent review stated,

"Pam's work continues to be accurate, thorough and completed in a dependable fashion."  *Id.*, Ex.

16 (Johnson's 1997 Performance Evaluation); *see also id.*, Exs. 11-16 (1990, 1992, 1994, 1995,

and 1996 Johnson Performance Evaluations).

After consulting with Borer, The Washington Times gave Palmer a raise, effective March 23, 1998, of $72.53 per week.  Def.'s Stmt. ¶ 86; Pl.'s Resp. ¶ 86.  This increase constituted a raise of 11% over her base salary, and brought Palmer's salary to $38,500.  *Id.*  The terms, effective date, percentage increase, and final salary provided to Palmer were identical to the terms, effective date, percentage increase, and final salary provided to Reddin.  *Compare* Def.'s Mot. for Summ. J., Ex. 21 (Personnel Action Form for Sherrie Palmer) *with id.*, Ex. 22 (Personnel Action Form for Les Reddin); *see also* Def.'s Stmt. ¶ 89; Pl.'s Resp. ¶ 89.  Like Reddin, Palmer was entitled to receive an additional $1,500.00 in reimbursement for tuition for educational pursuits, bringing her total increase to 15% over her prior year's base salary.  *Id.*; *see also* Def.'s Stmt. ¶¶ 87, 89; Pl.'s Resp. ¶¶ 87, 89.  Joo signed off on the raise for Palmer, just as he had signed off on the raises for Reddin. Def.'s Stmt. ¶ 88; Pl.'s Resp. ¶ 88.

With respect to Plaintiff, Edwards and Borer conferred, with Edwards initially noting that he was not planning on providing Plaintiff a raise.  *See* Def.'s Mot. for Summ. J., Ex. 9 (7/10/01 Borer Dep.) at 237:15-19.  However, Borer "want[ed] something for her" because he "want[ed] something for everybody" in the Human Resources Department.  *Id.* at 237:19-20.  Accordingly, Borer advocated for a 3% raise for Plaintiff, "[w]hich was 3 percent more than anybody else [he] kn[e]w of had in mind."  *Id.* at 237:9-14.  Edwards then agreed that "[t]he 3 percent – if [Plaintiff] got 3 percent, it was adequate . . . because that's the sort of semi-cost of living arrangement."  *Id.*, Ex. 12 (9/26/01 Edwards Dep.) at 57:13-22.  According to Edwards, Borer – the Director of Human Resources – was the individual responsible for the raise provided to Plaintiff.  *Id.* at 57:8-12; *see also* Def.'s Mot. for Summ. J., Ex. 23 (Johnson's 9/20/03 Test. Before Mag. Judge Facciola) at 60-61 (admitting that Borer was responsible for determining her raise).  While this raise was less than

14

the raises provided to Reddin and Palmer, Borer felt that "it did not appear to be logical that they would all have the same expectations since they worked three different jobs, so I didn't draw parallels." *Id.*, Ex. 9 (7/10/01 Borer Dep.) at 238:1-6.

No one kept Plaintiff from marketing herself and finding out if she could get a position outside The Washington Times making more money, and Edwards told both Johnson and Palmer that if they did not think they were being paid fairly, they could both market themselves and look for another job. Def.'s Stmt. ¶ 98; Pl.'s Resp. ¶ 98. Taking up Edwards' suggestion, Palmer submitted a notice of resignation on June 12, 1998, with her resignation effective as of June 19, 1998. Def.'s Stmt. ¶ 99; Pl.'s Resp. ¶ 99.

F.   *Plaintiff Files an EEOC Charge and Questions Commence Regarding Use of Confidential Information*

Unlike Palmer, Plaintiff – who was unhappy with her raise – chose not to resign from The Washington Times. Rather, on April 24, 1998, Plaintiff filed a charge with the EEOC. Def.'s Stmt. ¶ 24; Pl.'s Resp. ¶ 24. Before filing the charge, Plaintiff never made a written complaint of discrimination to anyone at The Washington Times, and that included not making a written complaint to Palmer, who was then the Employment Specialist; to Borer, the Human Resources Director; or to Edwards, the General Manager. Def.'s Stmt. ¶ 25; Pl.'s Resp. ¶ 25. Moreover, prior to the filing of the EEOC charge, Plaintiff never made any oral complaint to the Human Resources Department. Def.'s Stmt. ¶ 26; Pl.'s Resp. ¶ 26. Plaintiff's April 24, 1998 EEOC Charge contended that:

> For the past few years, I have been performing many duties beyond my job title. I found that a Caucasia[n] coworker has been giving a substantial increase after he threatened to resign from the company.
>
> The Respondent has given no reason for the increase of a Caucasian male coworker's salary. In addition, the Respondent has stated that there is not enough

money in the budget for my pay increase request.

I believe that I have been discriminated against because of my race (Black) and my
religion (Protestant) in violation of the Civil Rights Act of 1964 as amended.

Pl.'s Opp'n, Ex. 62 (4/24/98 Johnson EEOC Charge) at 1.  Plaintiff listed the "earliest" "date

discrimination took place" as February 1, 1998 on her charge.  *Id.*

Around the time of Plaintiff's EEOC filing, Ronald Clarke – responsible for managing The

Washington Times' security department – was called to the Human Resources Office "because there

was a complaint made by Mr. Reddin that someone had tampered with his computer."  Def.'s Mot.

for Summ. J., Ex. 14 (7/12/01 Clarke Dep.) at 37:9-13.  While Clarke was there, Reddin relayed his

concerns that someone "had gone into his computer," though he did not identify any potential

suspects.  *Id.* at 90:13-18.  Borer also received Reddin's report that someone without authorization

had accessed his computer.  Def.'s Stmt. ¶ 102; Pl.'s Resp. ¶ 102.  Borer considered the possibility

that either Plaintiff or Palmer was the individual responsible for the unauthorized access, but rather

than question them, he simply increased security in the office by placing an alarm on Reddin's door.

Def.'s Mot. for Summ. J., Ex. 9 (7/10/01 Borer Dep.) at 76:6-17.

Questions regarding confidential information and access to Reddin's computer intensified

after Plaintiff submitted the three (3) memoranda that Reddin had drafted in early 1998 advocating

for his raise as part of the supporting documentation for her EEOC Charge.  Def.'s Stmt. ¶ 104; Pl.'s

Resp. ¶ 104.  Plaintiff received these documents from Palmer, who admitted to Plaintiff that she had

copied them from Reddin's computer.  Def.'s Mot. for Summ. J., Ex. 3 (6/25/01 Johnson Dep.) at

144:1-145:9; *id.*, Ex. 7 (7/23/01 Palmer Dep.) at 94:7-95:21.  Palmer also obtained Borer's

performance evaluation, which she submitted to the EEOC.  *Id.*, Ex. 3 (6/25/01 Johnson Dep.) at

145:5-9.

As such, Plaintiff knew about the unauthorized access by Palmer – which occurred prior to her June 1998 resignation – and did not report it.  Def.'s Stmt. ¶ 107; Pl.'s Resp. ¶ 107.  Plaintiff was aware that it was not proper for one employee to go into another employee's computer and pull out personnel information such as Reddin's three letters.  Def.'s Stmt. ¶ 108; Pl.'s Resp. ¶ 108. Plaintiff was also aware that it was not proper for employees to have unauthorized access to documents or to fail to report such a violation of newspaper policy.  Def.'s Stmt. ¶¶ 109-110; Pl.'s Resp. ¶ 109-110.  Plaintiff was cognizant of the fact that going into another employee's computer and pulling out personnel information, like Reddin's three memoranda, could well be a firing offense.  Def.'s Stmt. ¶ 111; Pl.'s Resp. ¶ 111.  Indeed, Plaintiff herself during the deposition process admitted that she should have, but did not, report to anyone at The Washington Times that Palmer had violated her obligations and the company's policy by her unauthorized access to Reddin's computer.  Def.'s Stmt. ¶ 112; Pl.'s Resp. ¶ 112.  In part, Plaintiff chose not to report Palmer because she was friends with Palmer.  Def.'s Mot. for Summ. J., Ex. 3 (6/25/01 Johnson Dep.) at 147:3-19.

G.      *Tensions Rise in the Human Resources Department as Plaintiff's Behavior Raises the Ire of Her Co-Workers*

Throughout 1998, Plaintiff failed to cooperate on occasion with her supervisor, Borer, and in internal investigations.  Plaintiff was aware that Borer, as her supervisor, could ask her for information, by making such requests in writing, by email, by note, or through a secretary if he wanted to and it was her responsibility to provide accurate information to him.  Def.'s Stmt. ¶ 116; Pl.'s Resp. ¶ 116.  On occasion throughout 1998, Borer sent a secretary to Plaintiff in order to request information from her; on each occasion, Plaintiff responded, "I don't know."  Def.'s Stmt. ¶ 117; Pl.'s Resp. ¶ 117.  Plaintiff knew when she responded to the secretary's inquiry seeking

17

information about the Human Resources Department on Borer's behalf, she actually knew the

answer but refused to provide it.  Def.'s Mot. for Summ. J., Ex. 3 (6/25/01 Johnson Dep.) at 138:9-

21.  Plaintiff took this course despite knowing that the secretary came at Borer's request to obtain

information for him, and despite her obligation to cooperate with personnel in the Human Resources

Department to serve the best interest of The Washington Times.  Def.'s Stmt. ¶¶ 119-120; Pl.'s

Resp. ¶¶ 119-120.

      During the Summer and early Fall of 1998, the relationship between Plaintiff and Reddin

also apparently began deteriorating.  On September 17, 1998, Reddin complained to Borer about

Plaintiff's conduct.  Among other things, Reddin told Borer that Johnson had told him to "shut up"

on more than one occasion, and had told him to get out of an office where he typically worked.

Def.'s Stmt. ¶ 122; Pl.'s Resp. ¶ 122 (not contesting that Reddin made these accusations).  On

October 5, 1998, Reddin reported another complaint to Borer, wherein he reported, among other

things, that while speaking on the telephone, Johnson had used the "f-word" when speaking with

someone about the incident which had occurred between Reddin and Plaintiff earlier in September.

Def.'s Stmt. ¶ 123; Pl.'s Resp. ¶ 123.  By a memo dated October 5, 1998, Borer requested that

Plaintiff meet with him to discuss Reddin's complaint or that she respond to him substantively in

writing.  Def.'s Stmt. ¶ 124; Pl.'s Resp. ¶ 124.  Such an interview or request for a writing was

typical of the investigative process at the Human Resources Department.  *See* Def.'s Mot. for

Summ. J., Ex. 7 (7/23/01 Palmer Dep.) at 207:17-208:9.  Plaintiff never responded substantively in

writing to the complaint.  Def.'s Stmt. ¶ 125; Pl.'s Resp. ¶ 125.  After some reluctance and

apparently an initial refusal to meet, Plaintiff ultimately met with Borer.  Def.'s Mot. for Summ. J.,

Ex. 3 (6/25/01 Johnson Dep.) at 177:1-11.  In her deposition, Plaintiff admitted that she had in fact

told Reddin to "shut up" on two occasions and had told him to get out of an area where he works

from time to time.  Def.'s Stmt. ¶ 127; Pl.'s Resp. ¶ 127.

      H.    *The Human Resources Department's Guarantee of Confidentiality is Rocked by Disclosures in Sheletha Howard's Discrimination Case*

Following Sheletha Howard's termination in January 1997, Howard – the former Human Resources Department secretary – filed a lawsuit in the United States District Court for the District of Columbia alleging discrimination in violation of Title VII of the 1964 Civil Rights Act as amended.  Def.'s Stmt. ¶ 128; Pl.'s Resp. ¶ 128.  Defendant deposed Howard on October 8 and October 28, 1998 as part of that litigation.  Def.'s Stmt. ¶ 129; Pl.'s Resp. ¶ 129.  On October 8, 1998, Howard, who was represented by counsel, testified under oath in her deposition that:  (1) she was the secretary in the Human Resources Department at The Washington Times and her title never changed; Def.'s Stmt. ¶ 130; Pl.'s Resp. ¶ 130; (2) her starting salary was $9.62 per hour, which translated to approximately $20,000 per year, and her ending salary was $10.40 per hour, which translated to approximately $21,000-$22,000 per annum, *see* Def.'s Mot. for Summ. J., Ex. 28 (10/8/98 Howard Dep.) at 27:12-28:1; (3) she was friends with both Plaintiff and Palmer, *see* Pl.'s Opp'n, Ex. 10 (10/8/98 Howard Dep.) at 53:10-15 (also identifying Reddin and Borer as her friends); (4) after she was fired from The Washington Times, she told both Plaintiff and Palmer about her termination, Def.'s Stmt. ¶ 130; Pl.'s Resp. ¶ 130; and (5) Plaintiff and Palmer each knew from Howard personally in early 1997 that she had filed a complaint with the District of Columbia Office of Human Rights, Def.'s Stmt. ¶ 130; Pl.'s Resp. ¶ 130.

In support of her EEOC Charge, Howard submitted certain documents to the District of Columbia Office of Human Rights, which were confidential leave of absence documents from The Washington Times' Human Resources Department personnel records.  Def.'s Stmt. ¶¶ 131-132; Pl.'s Resp. ¶¶ 131-132.  Borer was "shocked" on the first day of Howard's deposition to see these

confidential "leave of absence" files from Plaintiff's office, especially because the abrupt, unplanned nature of Howard's departure in the Fall of 1996 would have meant that Howard herself could not have accessed the documents while at The Washington Times with an eye to litigation. Def.'s Stmt. ¶¶ 63, 133; Pl.'s Resp. ¶¶ 63, 133. Following Howard's testimony on October 8, 1998, Borer thought that if he was going to do his job properly, he had to keep his eyes open in the whole office – everyone's offices – and figure out how confidential material was being disclosed by the Human Resources Department. Def.'s Stmt. ¶ 134; Pl.'s Resp. ¶ 134.

After the completion of Howard's testimony on October 8, 1998, Borer returned to the Human Resources Department's offices, where he found a "Post-It" note that appeared to have been inadvertently left on the counter close to the leave of absence files; the "Post-It" note "had a few things on it about leave of absence files." Def.'s Stmt. ¶¶ 135-136; Pl.'s Resp. ¶ 135-136; Def.'s Mot. for Summ. J., Ex. 9 (7/10/01 Borer Dep.) at 62:3-23. On October 9, 1998, Clarke – The Washington Times' head of security – came to the Human Resources Department at Borer's request to investigate the possible unauthorized release of or access to confidential information. Def.'s Stmt. ¶ 137; Pl.'s Resp. ¶ 137. At that time, Borer wanted Clarke to witness Borer opening and accessing Plaintiff's computer. *See* Def.'s Mot. for Summ. J., Ex. 14 (7/12/01 Clarke Dep.) at 47:3-48:3; *id.*, Ex. 31 (Clarke's 10/12/98 Confidential Memorandum to Investigative File) (summarizing these events). With Clarke present, Borer accessed Plaintiff's computer and found two files that merited further attention; one was entitled "OUR CASE," with a screen listing date of October 8, 1998, while the other was entitled "LES REDDIN ANGRIER," with a screen listing date of September 17, 1998. *Id.* The "OUR CASE" summary had in it confidential information about Borer, including his personnel evaluation by the previous Director of the Human Resources Department (Martin), which had come from his personnel file. Def.'s Stmt. ¶ 140; Pl.'s Resp. ¶ 140.

Borer told Clarke that he was concerned that someone had – without authorization – accessed and copied his personnel file. *See* Def.'s Mot. for Summ. J., Ex. 14 (7/12/01 Clarke Dep.) at 45:2-20; *id.*, Ex. 31 (Clarke's 10/12/98 Confidential Memorandum to Investigative File) (summarizing these events). Clarke also inspected Borer's personnel file, and observed that documents in it appeared to have been tampered with given the fact that a staple had obviously been removed and then replaced in a different location on Borer's personnel evaluation. *See* Def.'s Mot. for Summ. J., Ex. 14 (7/12/01 Clarke Dep.) at 46:10-18; *id.*, Ex. 31 (Clarke's 10/12/98 Confidential Memorandum to Investigative File) (summarizing these events). Based on what Borer had shown him and what they had uncovered, Clarke became "concerned that there was a release of confidential information. That's – that's just unethical and strictly prohibited." *See* Def.'s Mot. for Summ. J., Ex. 14 (7/12/01 Clarke Dep.) at 64:3-14.

On another occasion around the same time period, Borer became concerned that someone had been in his office were he kept legal files, and he grew concerned that it could have been Plaintiff. *See* Def.'s Mot. for Summ. J., Ex. 9 (7/10/01 Borer Dep.) at 70:5-10. Borer believed that someone had been in his office and file cabinet because one file cabinet had been locked; Borer did not have the key to this file cabinet, and therefore it had been kept unlocked previously. *Id.* at 70:11-21. According to Borer, he had to have security come and drill open the lock so that he could get into his own file cabinet. *Id.* at 70:22-71:15; *but see* Pl.'s Opp'n, Ex. 5 (7/12/01 Clarke Dep.) at 84:8-15 (testifying that Borer did not contact him personally about this incident, and noting that he was unaware if anyone on his staff had been contacted and drilled the lock). While Borer once again consider Plaintiff a potential suspect in this incident, he did not question her personally about it at the time and only contacted security. *Id.* at 71:2-15.

I.      *Further Concerns About Possible Disclosure of Confidential Information*

During this same time period, Joyce Teague, who was an employee at the newspaper in the mailroom, had filed a claim against her employer and her supervisor, David Coleman.  Def.'s Stmt. ¶ 149; Pl.'s Resp. ¶ 149; Def.'s Mot. for Summ. J., Ex. 9 (7/10/01 Borer Dep.) at 16:22-17:1 (noting that Teague works in the mailroom).  Borer believed that Plaintiff was friends with Teague, given that he thought they often went to lunch together.  *See* Def.'s Mot. for Summ. J., Ex. 9 (7/10/01 Borer Dep.) at 16:9-20.  On October 21, 1998, Borer had been out of the office for the day at a conference, and returned back to his office around 6:00 p.m.  *Id.*, Ex. 1 (Borer Aff.) ¶ 17.  Upon his return, Borer noticed that there were many staples on the staple remover at Plaintiff's desk and many used staples in her trash, which caused him to wonder whether Plaintiff had been copying documents such as those he had seen at Howard's deposition on October 9, 1998.  *Id.*, Ex. 14 (7/12/01 Clarke Dep.) at 46:2-18; Pl.'s Resp. ¶ 151 (noting that Plaintiff's desk was in a shared and public office space).  Borer found a torn-up note in Plaintiff's trash basket; after he pieced the note together, he could observe that the note was entitled "Specialist" and appeared to him to be in Plaintiff's handwriting.  *Id.*, Ex. 9 (7/10/01 Borer Dep.) at 17:19-18:10; *id.*, Ex. 32 (Copy of the "Specialist" Note).  To Borer, the "Specialist" note, which contained the name, address, and telephone number of Teague's attorney, appeared to be notes of communications between Teague or her attorney and Plaintiff concerning confidential information being sought from Plaintiff relating to Teague's case or claims against The Washington Times.  *Id.*  To Borer, the "Specialist" note appeared to contain a list of action items for Plaintiff to do, including retrieving documents such as Coleman's personnel file and evaluation.  *Id.*  In the event that an employee such as Plaintiff had received an inquiry from a workman compensation claimant's counsel, the proper step would have been for the employee to refer the counsel to Clarke's counsel – not conduct their own search.  *Id.*,

22

Ex. 14 (7/12/01 Clarke Dep.) at 25:10-26:11; Pl.'s Resp. ¶ 156 (agreeing with Clarke's assessment,

but noting that "it also would have been appropriate for Johnson to gather documents in connection

with a workman compensation claim for Mr. Clarke's office").

On another occasion in the same timeframe, Borer visited Plaintiff's office and saw

Coleman's personnel information file on her computer screen. *Id.*, Ex. 9 (7/10/01 Borer Dep.) at

13:7-16:8. When Borer questioned Plaintiff as to why Coleman's personnel file was on her screen,

Plaintiff replied that a credit agency had called regarding Coleman; however, given the fact that it

was only 9:15 a.m. at the time of this conversation and Plaintiff could not recall which credit bureau

had called, Borer found Plaintiff's explanation unreasonable and unpersuasive. *Id.* Borer also

found in Plaintiff's trash items regarding Coleman's personnel file at a later point. *Id.* at 65:1-10.

Additionally, Borer discovered on Plaintiff's calendar a note apparently referencing Teague and

indicating that perhaps she had gone to lunch with Teague on the same day that Borer had gone to a

meeting regarding the Teague case – October 16, 1998. *Id.*, Ex. 1 (Borer Aff.) ¶ 30; *id.*, Ex. 34

(10/16/98 Calendar Entry from Plaintiff's Calendar) (with note, "Lunch – JT"). Finally, around the

same time, Borer found and pieced together from Plaintiff's trash basket a printout stating:

"STARTED COLLECTING ITEMS TO SHOW JIM BORER IS DOING LEGAL WORK AS

OCTOBER 16, 1998." *Id.*, Ex. 33 (Note re: Borer's Legal Work); *d.*, Ex. 1 (Borer Aff.) ¶ 24; *id.*,

Ex. 9 (7/10/01 Borer Dep.) at 69:1-22. Based upon these findings and the inferences flowing from

them, Borer believed that confidential information was being released from Plaintiff's office. *Id.*,

Ex. 9 (7/10/01 Dep.) at 17-18.

Borer's concerns were heightened on October 23, 1998, when Keith Cooperrider, The

Washington Times' Chief Financial Officer, heard that someone in the Human Resources

Department had – without authority – disclosed to a new hire (a transfer from another position) a

former employee's salary, which resulted in the new hire's request for a greater salary than had been

offered by the paper.  *Id.*, Ex. 1 (Borer Aff.) ¶ 25; *id.*, Ex. 9 (7/10/01 Borer Dep.) at 89:6-13; *id.*,

Ex. 35 (10/27/98 Borer Memorandum to File re: "PRF: Confidentiality; Johnson; Sharpe") at 1-4

(recounting his conversations with Cooperrider, his preliminary investigation with the new hire, and

concluding with "I will talk to Pamela Johnson").  Borer apparently conducted an investigation into

the matter, discussing the matter with the new hire, and came to the suspicion that Plaintiff was

behind this disclosure.  *Id.*  On that same day, Borer also suspected and believed for the first time

that someone had accessed his voice mail messages and listened to them without his permission.  *Id.*

Tired of "feel[ing] the wrath of a person in upper management . . . for the disclosure of information

he understood to be held by H.R. as confidential," Borer resolved to "talk to Pamela Johnson."  *id.*,

Ex. 35 (10/27/98 Borer Memorandum to File re: "PRF: Confidentiality; Johnson; Sharpe") at 1-4.

> J.    *Testimony in Howard's Second Deposition Heighten The Washington Times'*
> *Concerns Regarding Plaintiff and Bring The Situation to a Head*

Howard's deposition testimony under oath and accompanied by counsel in her civil case

against The Washington Times continued on October 28, 1998.  Def.'s Stmt. ¶ 167; Pl.'s Resp. ¶

167.  Borer was present on behalf of The Washington Times for this testimony.  Def.'s Stmt. ¶ 169;

Pl.'s Resp. ¶ 169.  Howard later recanted much of her October 28, 1998 testimony in her August

22, 2001 deposition in this case by claiming that all documents were mailed to her anonymously,

and contending that she only testified as she did on October 28, 1998 because The Washington

Times' counsel in that matter[5] badgered her during questioning and – during the deposition –

threatened the livelihood of her husband's military career.  *See* Pl.'s Opp'n, Ex. 10 (8/22/01

---

[5] Counsel for The Washington Times in the case relating to Ms. Howard is the same counsel
appearing before the Court in this case.

24

Howard Dep.) at 114:6-120:10 (noting that she dropped her lawsuit after her testimony).  Despite

this claim, it is undisputed that *on October 28, 1998*, Howard testified:

- After leaving The Washington Times, she requested an employment verification. Def.'s Mot. for Summ. J., Ex. 28 (10/28/98 Howard Dep.) at 498.

- Howard was willing to enlist her friends, Plaintiff and Palmer, to provide false information for her. *Id*. at 513, 522.

- Both Palmer and Johnson told Howard that they had verified her employment at $31,000 as an Employment Specialist, and that they both knew that the verification was false. *Id*. at 522.

- At Howard's request, Palmer provided a false employment verification for her, providing inaccurate information as to Howard's employment position and title, her salary, and her dates of employment. *Id*. at 505-11.

- Howard was aware that Plaintiff and Palmer knew that they had provided false information to her. *Id*. at 522.

- Howard enlisted Plaintiff and Palmer to get for her, after she was no longer with the paper, confidential personnel records including doctors' notes about employees who had taken leaves of absences. *Id*. at 552.

- Howard had Plaintiff and Palmer pull those documents from the personnel records and provide them to her even though she knew it was wrong for them to take such an action. *Id*.

- Both Plaintiff and Palmer pulled confidential personnel files for her after she had left The Washington Times and provided those to her. *Id*. at 552-54.

- Howard agreed that Plaintiff and Palmer could be fired for having provided confidential personnel records to her. *Id*. at 555-56.

- Howard acknowledged that she had previously testified falsely as to how she had received the confidential "leave of absence" records because she was trying to conceal her agreement with Plaintiff and Palmer to provide false information to employers and to take confidential personnel documents from The Washington Times' files and to provide them to her. *Id*. at 573-75.

During her deposition in this case, Plaintiff agreed that if someone at The Washington Times

provided confidential personnel records to an individual such as Howard after that employee no

longer worked with the company, then that action would not be consistent with the policies of The

Washington Times and would be a violation of the duty of confidentiality to the newspaper. Def.'s

Stmt. ¶ 169; Pl.'s Stmt. ¶ 169. Plaintiff also agreed that such an action would be the basis for

disciplinary action, including firing, because "leave of absence" records are highly confidential

personnel records that are not to be misused. Def.'s Stmt. ¶¶ 170-171; Pl.'s Stmt. ¶¶ 170-171.

Plaintiff further noted that she had no reason to believe that Borer, Martin, Reddin, or Palmer

provided the "leave of absence" documents to Howard. Def.'s Stmt. ¶ 175; Pl.'s Stmt. ¶ 175.

Personnel files were kept in file drawers in Plaintiff's office, and Plaintiff had access to such files.

Def.'s Stmt. ¶ 177; Pl.'s Stmt. ¶ 177. Plaintiff was also aware that Howard testified under oath on

October 28, 1998 that Plaintiff had given her confidential personnel files from The Washington

Times after Howard no longer worked there. Def.'s Stmt. ¶ 178; Pl.'s Stmt. ¶ 178. As such, given

these facts, Plaintiff herself agreed during her deposition that her employer could have reasonably

formed the view that she had stolen the "leave of absence" documents from the Human Resources

Department and given them to Howard. Def.'s Mot. for Summ. J., Ex. 3 (6/25/01 Johnson Dep.) at

130:2-11; *but see id.* at 130:12-20 (Plaintiff does not agree that, based on her friendship with

Howard alone, the paper could have come to such a conclusion).

  K.  *Plaintiff's Termination from The Washington Times*

  When faced with Howard's October 28, 1998 testimony, Borer believed that Plaintiff and

Palmer were Howard's friends, and that Howard had tried to protect them in her first deposition but

was basically confronted and confessed in her second deposition. Def.'s Mot. for Summ. J., Ex. 9

(7/10/01 Borer Dep.) at 167. He did not believe that it was possible for Howard to have copied the

"leave of absence" files before she left The Washington Times, given the circumstances of her

departure. *Id.* at 164. Borer believed that Plaintiff had released confidential files based on, among

other things, the files from her office that were produced by Howard and Howard's admission that

Plaintiff had provided those files to her.  *Id.* at 87.  As such, Borer believed that he had a

responsibility to investigate and question Plaintiff about these personnel and confidentiality matters,

which he considered to be extremely important.  *Id.* at 20, 58-59.

Given his beliefs, Borer met with Plaintiff on October 29, 1998 – the day after Howard's

second deposition.  Def.'s Stmt. ¶ 185; Pl.'s Resp. ¶ 185.  Clarke accompanied Borer to this meeting

with Plaintiff.  *See* Pl.'s Opp'n, Ex. 2 (6/25/01 Johnson Dep.) at 103:14-15.[6]  At the meeting, Borer

sought to ask her questions about personnel matters.  Def.'s Stmt. ¶ 188; Pl.'s Resp. ¶ 188.  Borer

had typed up a written note prior to the meeting, and informed Plaintiff that he had to question her

regarding important personnel matters, warning her that refusal to answer his questions could result

in her discharge.  *See* Def.'s Mot. for Summ. J., Ex. 9 (7/10/01 Borer Dep.) at 59:1-6; *see also* Pl.'s

Opp'n, Ex. 61 (Borer's 10/28/98 Note re: "Employment" to Johnson).  At the meeting, Borer asked

Plaintiff a number of questions regarding whether she provided false data on Howard's employment

verification and if she had disclosed confidential information to Teague, Howard, the new hire, and

others.  *See* Def.'s Mot. for Summ. J., Ex. 9 (Borer Dep.) at 42; Pl.'s Opp'n, Ex. 2 (6/25/01 Johnson

Dep.) at 105:7-106:6.  While Plaintiff believed that she was answering all of Borer's questions, and

that he was simply repeating the same series of questions over and over during the fifteen (15)

_____

[6] Plaintiff had actually been out of the office from October 23, 1998 to October 28, 1998 in connection with work-related stress.  *See* Pl.'s Opp'n, Ex. 5 (7/12/01 Clarke Dep.) at 91:22-92:22, 95:5-10, 98:13-100:12; *see also id.*, Ex. 74 (Concentra Medical Center – Initial Visit Report) at 1 (Plaintiff told medical providers that she felt stressed and scrutinized since her April 1998 EEOC Charge and allegedly had been yelled at by her supervisor on October 23, 1998).  Plaintiff returned to work on October 29, 1998 to meet with Clarke to inform him that she had been cleared to return to work at The Washington Times with a restriction.  *See id.* at 109:3-111:5; *id.*, Ex. 1 (Johnson Aff.) ¶ 15; *id.*, Ex. 75 (Concentra Medical Center – Restricted Return to Work Form).  Accordingly, Plaintiff did not believe that she would be dealing with Borer on the day of October 29, 1998 and his choice to accompany Clarke was a surprise to Plaintiff.

minute meeting, *see* Pl.'s Opp'n, Ex. 2 (6/25/01 Johnson Dep.) at 102:14-18, Clarke remembers

that she evaded Borer's question regarding providing false verification data to Howard, *see* Def.'s

Opp'n, Ex. 14 (7/12/01 Clarke Dep.) at 125:13-126:4, and Borer recalled that Plaintiff would

answer a question and then refuse to answer follow-up questions, *see* Def.'s Opp'n, Ex. 9 (7/10/01

Borer Dep.) at 7:3-20, 42.   Both Clarke and Borer remember Borer telling Plaintiff that she would

be fired if Plaintiff refused to answer Borer's questions, *see* Def.'s Opp'n, Ex. 9 (7/10/01 Borer

Dep.) at 58-59, 83-84, 86; *id.*, Ex. 14 (7/12/01 Clarke Dep.) at 128:15-129:6, 131:14-21 (noting

that after Plaintiff was informed of this, she responded: "I can't deal with this."), while Plaintiff

recalls that Borer never used words to this effect, *see* Pl.'s Opp'n, Ex. 1 (Johnson Aff.) ¶ 24; *id.*, Ex.

2 (6/25/01 Johnson Dep.) at 102:14-15.   Clarke concurred with Borer's belief that Plaintiff was

uncooperative during the meeting.   *See* Def.'s Mot. for Summ. J., Ex. 14 (7/12/01 Clarke Dep.) at

129:7-21.

According to Borer's recollection, Plaintiff continued to refuse to answer some of his

questions, and threatened to leave.   *Id.*, Ex. 9 (7/10/01 Borer Dep.) at 83:20-22.   In contrast,

Plaintiff recalls that she did not threaten to leave the room during the investigatory interview.   *See*

Pl.'s Opp'n, Ex. 2 (6/25/01 Johnson Dep.) at 105:1-3.   According to Borer, after reminding Plaintiff

again that she need to answer his important questions "and if she left without answering those

questions, that she would be discharged and that I had a note in my hand."   Def.'s Mot. for Summ.

J., Ex. 9 (7/10/01 Borer Dep.) at 83:19-84:2.   Borer recalls that Plaintiff then "crossed the room and

took that note out of my hand, scanned it and then left, slamming the door."   *Id.* at 84:3-5.   Clarke

remembers Borer handing Plaintiff the note, who then read it, turned around, and left the office by

slamming the door "hard enough where all the stuff c[a]me down off of my wall and dumped some

posters and things that were behind it."  Pl.'s Opp'n, Ex. 5 (7/12/01 Clarke Dep.) at 132:3-18.

Clarke did not recall Borer verbally announcing Plaintiff's termination.  *Id.* at 131:4-132:7.  Clarke

then followed Plaintiff out of the building.  *See* Def.'s Mot. for Summ. J., Ex. 14 (7/12/01 Clarke

Dep.) at 134:15-21. Clarke did not believe that Borer acted unreasonably during the meeting.  *Id.* at

134:7-11.  Plaintiff's employment with The Washington Times was terminated after this meeting.

*See* Pl.'s Opp'n, Ex. 2 (6/25/01 Johnson Dep.) at 102:8-10 (Q: "You were fired after a meeting

with Mr. Borer, correct?" A: "Yes."); *see also* Pl.'s Opp'n, Ex. 68 (10/26/99 Borer EEOC Aff.) at

2 ("Because Ms. Johnson refused to answer my questions, she was terminated.").

    The note drafted by Borer prior to the meeting, which ended up in Plaintiff's possession, read

in full:

> It appears that your relationship with the company has been irreparably harmed.
> Several incidents have occurred including:
>
> - copying and/or passing copies of confidential personnel files to a person suing the
> company;
> - serving as a reference while using a false title for yourself;
> - agreeing to verify false data on an ex-employee's resume;
> - releasing confidential information to an employee.
>
> You are being discharged for disclosing confidential information.
>
> Employee Handbook, page 4, under the heading entitled, **"Confidential
> Information"** states: "Disclosure of confidential information may lead to discipline
> up to and including discharge."
>
> Employee Handbook, page 7, under the title: **I.  Commission of Any One of the
> Following Acts Will Be Considered Just Cause for Immediate Dismissal** "h.
> theft, misappropriation, misuse, or willful destruction of a fellow employee's or
> Company property, or unauthorized removal of such . . . ."

Pl.'s Opp'n, Ex. 61 (Borer's 10/28/98 Note re: "Employment" to Johnson) at 1 (emphasis in

original).  At least one other employee of The Washington Times, a white male, was dismissed from

the newspaper the previous year (1997) for a somewhat similar disclosure of confidential company

information and work-product to a third party. *See* Def.'s Mot. for Summ. J., Ex. 9 (7/10/01 Borer

Dep.) at 253:5-18 ("it was somebody in the production department that was discharged for

disclosing confidential information"); *id.*, Ex. 40 (one-page, unnumbered termination letter of a

Washington Times employee dated February 4, 1997, and a one page attachment to that letter dated

January 27, 1997); Pl.'s Resp. ¶ 217 (drawing a distinction between this termination and Plaintiff's

firing, and noting that the employee was terminated for "violated the 'Advertising Ethics' section of

the Employee Handbook" for releasing an advertisement prior to publication).

     L.    *Events Following Plaintiff's Dismissal*

     Following Plaintiff's departure from The Washington Times on October 28, 1998, Elizabeth

Henkin, a white Unification Church member, was hired to fill her position as the HRIS Specialist in

the Human Resources Department.  Def.'s Stmt. ¶¶ 215-216; Pl.'s Resp. ¶¶ 215-216 (not disputing

this fact).  Henkin, who was working for about a year at another publication related to Defendant

and The Unification Church entitled "World & I" as the photo billing coordinator when she took the

position, was being paid – and continued to be paid – $14.48 by Defendant when she took the

position of HRIS Specialist with The Washington Times.  *See* Def.'s Mot. for Summ. J., Ex. 1

(Borer Aff.) ¶ 26 (attesting that the attached exhibit represents Henkin's Confidential Wage/Salary

History maintained by Defendant in the regular and ordinary course of business); *id.*, Ex. 39

(Confidential Wage/Salary History of Henkin); Pl.'s Opp'n, Ex. 7 (7/17/01 Henkin Dep.) at 18:1-

22, 55:3-21; *see also id.*, Ex. 7 (7/17/01 Henkin Dep.) at 17:14-23 (Henkin notes that she worked

at "World & I" approximately five years in the late 1980s/early 1990s before taking maternity

leave; she then re-joined "World & I" in the mid-1990s).[7]  In contrast, Plaintiff was earning $15.14

---

      [7] Plaintiff, in her Response to Defendant's Statement of Material Facts Not in Dispute,
wonders how this information can be accurate given that Henkin started with The Washington

per hour as the HRIS Specialist when she was terminated on October 28, 1998.  Def.'s Stmt. ¶ 22;

Pl.'s Resp. ¶ 22.  Plaintiff now argues that Henkin was unqualified for the position, *see* Pl.'s Resp. ¶

216 (citing Pl.'s Opp'n, Ex. 6 (7/12/01 Reddin Dep.) at 153:10-154:11 (giving his opinion that

Henkin was now qualified for the position, but was initially unqualified given the fact that she

occasionally inputted incorrect data when she first came aboard)), lacked experience, *id.* (citing Pl.'s

Opp'n, Ex. 3 (7/10/01 Borer Dep.) at 127:4-128:2 (agreeing that Henkin had no experience in a

human resources department but contending that she had a plethora of experience inputting data and

handling other responsibilities at World & I), and was brand new to The Washington Times, *id.*

(citing Pl.'s Opp'n, Ex. 7 (7/17/01 Henkin Dep.) at 15:4-18:22, 55:3-55:13 (admitting that while

she had worked for many years at World & I, she had never worked for The Washington Times).

Following Plaintiff's dismissal, she filed an Amended EEOC Charge on November 17,

1998, adding the fact that she was terminated on October 28, 1998 by The Washington Times to her

claim.  *See* Pl.'s Opp'n, Ex. 63 (11/17/98 Amended EEOC Charge) at 1.  During the EEO process,

the EEO found – based on the affidavit evidence before it – that Plaintiff had presented evidence

sufficient for it to render a conclusion that she was denied her 1998 salary increase request and

ultimately terminated because she was not a member of The Unification Church; however, the EEO

found no evidence that The Washington Times ever discriminated against Plaintiff based on her

race.  *See* Pl.'s Opp'n, Ex. 67 (6/6/00 EEO Letter of Determination) at 3.  Following this decision,

---

Times in November 1998, yet the salary history in Exhibit 39 lists the $14.45 rate as beginning on
"8/1/98" – i.e., before she was hired.  *See* Pl.'s Resp. ¶ 216.  Given that Defendant News World
Communications owns both publications, it seems logical that Defendant would keep all of
Henkin's salary information on the same form, regardless of whether it came from The Washington
Times or World & I – a fact borne out by Exhibit 39 to Defendant's Motion for Summary
Judgment.  Indeed, given this logical explanation, Borer's Affidavit attesting to the fact that the
attached form does relate to Henkin, and no evidence to the contrary by Plaintiff, the Court accepts
Exhibit 39 as an accurate depiction of Henkin's salary.

Plaintiff filed a Complaint alleging race-based and religion-based discrimination by Defendant in the

Superior Court for the District of Columbia, Civil Division, on October 16, 2000. *See* 1/2/01

Notice of Removal, Ex. 1 (Pl.'s Compl.). Defendant removed Plaintiff's action to this Court

pursuant to 28 U.S.C. § 1441 on January 2, 2001. *See* 1/2/01 Notice of Removal. In her

Complaint, Plaintiff contends that: (1) Defendant discriminated against her in violation of the

District of Columbia Human Rights Act ("DCHRA"), Title VII, and 42 U.S.C. § 1981 on the basis

of her race and religion by denying her certain benefits, namely, the requested March 1998 salary

increase similar to the one provided to Reddin, *see* Compl. ¶¶ 13-16 (Count I – DCHRA), ¶¶ 25-28

(Count IV – Title VII), ¶¶ 37-40 (Count VII – Section 1981 Claim); *see also* Def.'s Mot. for

Summ. J., Ex. 3 (6/25/01 Johnson Dep.) at 80:1-4 (Plaintiff clarifies that she only claims

discrimination vis-á-vis her 1998 salary request, and does not claim that she was discriminated for

"the years when [she] got cost of living raises"); Pl.'s Resp. ¶ 210 (same); (2) Defendant unlawfully

retaliated against her for bringing an EEOC Charge by terminating her employment in violation of

the DCHRA, Title VII, and 42 U.S.C. § 1981, *id.* ¶¶ 21-24 (Count III – DCHRA), ¶¶ 33-36 (Count

VI – Title VII), ¶¶ 45-48 (Count IX – Section 1981 Claim); and (3) Defendant unlawfully

terminated her on October 29, 1998 for race and religion-based reasons in violation of the DCHRA,

Title VII, and 42 U.S.C. § 1981, *id.* ¶¶ 17-20 (Count II – DCHRA), ¶¶ 29-32 (Count V – Title

VII), ¶¶ 41-44 (Count VIII – Section 1981 Claim).

## II: LEGAL STANDARDS

### A.   *Rule 56 Summary Judgment Standards*

A party is entitled to summary judgment if the pleadings, depositions, and affidavits

demonstrate that there is no genuine issue of material fact in dispute and that the moving party is

entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Tao v. Freeh*, 27 F.3d 635, 638

(D.C. Cir. 1994).  Under the summary judgment standard, Defendant, as the moving party, bears the "initial responsibility of informing the district court of the basis for [its] motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits which [it] believe[s] demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  Plaintiff, in response to Defendants' motion, must "go beyond the pleadings and by [his] own affidavits, or depositions, answers to interrogatories, and admissions on file, 'designate' specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal citations omitted).

Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202  (1986).  To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the nonmoving party.  *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987); *Liberty Lobby*, 477 U.S. at 251, 106 S.Ct. 2505 (the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").  "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50, 106 S.Ct. 2505 (internal citations omitted).  "Mere allegations or denials in the adverse party's pleadings are insufficient to defeat an otherwise proper motion for summary judgment." *Williams v. Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996).  The adverse party must do more than simply "show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct.

33

1348, 89 L.Ed.2d 538 (1986).  Instead, while the movant bears the initial responsibility of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant to "come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Id.* at 587, 106 S.Ct. 1348 (citing Fed. R. Civ. P. 56(e)) (emphasis in original).

Importantly, "[w]hile summary judgment must be approached with specific caution in discrimination cases, a plaintiff is not relieved of her obligation to support her allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." *Morgan v. Fed. Home Loan Mortgage Corp.*, 172 F. Supp. 2d 98, 104 (D.D.C. 2001) (quoting *Calhoun v. Johnson*, No. 95-2397, 1998 WL 164780, at *3 (D.D.C. Mar. 31, 1998) (internal citation omitted), *aff'd*, No. 99-5126, 1999 WL 825425, at *1 (D.C. Cir. Sept. 27, 2000)); *see also Marshall v. James*, 276 F. Supp. 2d 41, 47 (D.D.C. 2003) (special caution "does not eliminate the use of summary judgment in discrimination cases") (citing cases).  "Summary judgment is not a 'disfavored procedural shortcut,' but is an integral procedural tool which promotes the speedy and inexpensive resolution of every case." *Marshall*, 276 F. Supp. 2d at 47 (quoting *Celotex Corp.*, 477 U.S. at 327).  Accordingly, the Court reviews the defendant's motion for summary judgment under a "heightened standard" that reflects "special caution." *Aka v. Washington Hosp. Ctr.*, 116 F.3d 876, 879 (D.C. Cir. 1997) (internal quotations omitted), *overturned on other grounds*, 156 F.3d 1284 (D.C. Cir. 1998) (en banc).  Nonetheless, while this special standard is more exacting, it is not inherently preclusive.  Although more circumspect, the Court will continue to grant a motion for summary judgment in which the nonmoving party has failed to submit evidence that creates a genuine factual dispute and the moving party is entitled to a judgment as a matter of law.

34

B.      *The McDonnell Douglas Framework for Discrimination Claims*

Plaintiff brings this action pursuant to Title VII, which states that all personnel actions

affecting employees "shall be made free from any discrimination based on race, color, religion, sex,

or national origin." 42 U.S.C. § 2000e-16(a). Plaintiff also brings the suit pursuant to the DCHRA

and 42 U.S.C. § 1981; however, "[t]he burdens of persuasion and production for claims raised

under § 1981 or under the D.C. law are identical to those for claims alleging discriminatory

treatment in violation of Title VII." *Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1553

(D.C. Cir. 1997) (citing cases); *see also Knight v. Georgetown Univ.*, 725 A.2d 472, 478 n.5

(D.C. 1999) (same); *Daka v. Breiner*, 711 A.2d 86, 94 (D.C. 1998) (same). As such, when the

Court refers to the "Title VII framework" in this Memorandum Opinion, it does so as a short-hand

reference to the framework governing claims arising under Title VII, the DCHRA, and 42 U.S.C. §

1981. Here, it is uncontested that Plaintiff was an employee during the relevant time period and

Defendant is an employer within the meaning of Title VII. The Court exercises jurisdiction over

Plaintiff's claims according to 28 U.S.C. § 1331.

To prove a Title VII violation, Plaintiff must demonstrate by a preponderance of the

evidence that the actions taken by Defendant were "more likely than not based on the consideration

of impermissible factors" such as race or gender. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S.

248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (internal quotation marks and citation omitted).

Where, as here, the record contains no direct evidence of discrimination, it is necessary to employ

the *McDonnell Douglas* tripartite burden-shifting framework. *Cones v. Shalala*, 199 F.3d 512,

516 (D.C. Cir. 2000) (citing *McDonnell Douglas v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36

L.Ed.2d 668 (1973)). It is the district court's responsibility to closely adhere to this analysis and go

no further, as it does not sit as a "super-personnel department that reexamines an entity's business

decisions." *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (internal citation and quotation marks omitted).

Under the *McDonnell Douglas* paradigm, Plaintiff has the initial burden of proving by a preponderance of the evidence a "*prima facie*" case of discrimination. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. If she succeeds, the burden shifts to Defendant to articulate some legitimate, non-discriminatory reason for Plaintiff's salary determination and/or termination, and to produce credible evidence supporting its claim. *Id.* Defendant's burden is only one of production, and it "need not persuade the court that it was actually motivated by the proffered reasons." *Burdine*, 450 U.S. at 254, 101 S.Ct. 1089; *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) ("[T]he determination that a defendant has met its burden of production (and has thus rebutted any legal presumption of intentional discrimination) can involve no credibility assessment."). As such, "the *McDonnell Douglas* framework shifts intermediate evidentiary burdens between the parties, [t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Morgan v. Fed. Home Loan Mortgage Corp.*, 328 F.3d 647, 651 (D.C. Cir. 2003), *cert. denied*, 540 U.S. 881, 124 S. Ct. 325, 157 L.Ed.2d 146 (2003); *see also Burdine*, 450 U.S. at 253, 101 S.Ct. 1089.

If Defendant is successful, then "the *McDonnell Douglas* framework -- with its presumptions and burdens -- disappear[s], and the sole remaining issue [is] discrimination *vel non*." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (internal citations and quotation marks omitted); *see also Burke v. Gold*, 286 F.3d 513, 520 (D.C. Cir. 2002) (once defendant offers a non-discriminatory explanation for its actions, the

presumption of discrimination "simply drops out of the picture") (quoting *St. Mary's Honor Ctr.*, 590 U.S. at 511, 113 S.Ct. 2742) .  At that point, Plaintiff has the burden of persuasion to show that Defendant's proffered reason was not the true reason for the employment decision.  *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089.  Pretext may be established "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  *Id.* at 256, 101 S.Ct. 1089; *see also Reeves*, 530 U.S. at 143, 120 S.Ct. 2097.  "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive."  *Reeves*, 530 U.S. at 147, 120 S.Ct. 2097 (citing *St. Mary's Honor Ctr.*, 590 U.S. at 517, 113 S.Ct. 2742) ("[P]roving the employer's reason false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination."); *see also Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1290 (D.C. Cir. 1998) (en banc) ("[A] plaintiff's discrediting of an employer's stated reason for its employment decision is entitled to considerable weight.").  Notably, the Supreme Court has taken care to instruct trial courts that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."  *Reeves*, 530 U.S. at 148, 120 S.Ct. 2097.  "[T]he trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual."  *Id.* at 143, 120 S.Ct. 2097 (quoting *Burdine*, 450 U.S. at 255 n.10, 101 S.Ct. 1089).

Accordingly, "to survive summary judgment the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a

discriminatory reason." *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003); *see also Aka*, 156 F.3d at 1290. The D.C. Circuit recently defined "all of the evidence" as "any combination of (1) evidence establishing the plaintiff's *prima facie* case; (2) evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff, such as independent evidence of discriminatory statements or attitudes on the part of the employer." *Holcomb v. Powell*, --- F.3d ----, 2006 WL 45853, at *5 (D.C Cir. Jan 10, 2006) (citing *Aka*, 156 F.3d at 1289). "At this stage, if [plaintiff] is unable to adduce evidence that could allow a reasonable trier of fact to conclude that [defendant's] proffered reason was a pretext for discrimination, summary judgment must be entered against [plaintiff]." *Paquin v. Fed. Nat'l Mortgage Ass'n*, 119 F.3d 23, 27-28 (D.C. Cir. 1997). "[T]he court must consider all the evidence in its full context in deciding whether the plaintiff has met his burden of showing that a reasonable jury could conclude that he has suffered discrimination." *Aka*, 156 F.3d at 1290.

## III: DISCUSSION

Plaintiff's claims resolve around two central events: (1) The Washington Times' March 1998 decision to provide her with a raise of 3.05% rather than her requested raise; and (2) Plaintiff's termination from The Washington Times on October 29, 1998 following her meeting with Borer. Because Plaintiff's claims neatly divide along these two incidents, in its discussion the Court shall first address Plaintiff's Title VII, DCHRA, and Section 1981 discrimination claims in the context of her March 1998 salary raise request, and then shall turn to an examination of Plaintiff's Title VII, DCHRA discrimination claims and her Title VII retaliation claims with respect to her October 1998 termination.

A.       *Plaintiff's Claims Arising From Her March 1998 Salary Request*

Count I, IV, and VII of Plaintiff's Complaint in this action relate to her allegation that

Defendant discriminated against her "based on her race and religion in favor of her co-worker, Les

Reddin," when dealing with raise requests by Human Resources Department employees in March

1998. *See* Pl.'s Opp'n at 9.  In support of her claim, Plaintiff notes that in February 1998, in

response to his initial salary demands and threat of resignation, Defendant increased the salary of

Reddin – a white male Unification Church member – by 16.58% to $667.85 per week. *Id.* at 10

(citing Pl.'s Opp'n, Ex. 29 (2/1/99 Reddin Personnel Action Form)).  At that time, Plaintiff was

earning $14.74 per hour, on a forty (40) hour work week totaling $589.60 per week – a difference

amounting to $78.25 per week.  In March 1998, Defendant once again gave into Reddin's salary

demands, increasing his salary again by 15% to $38,500 and providing him with a $1,500

education reimbursement. *Id.* (citing Pl.'s Opp'n, Ex. 28 (3/23/98 Reddin Personnel Action Form)).

In contrast, when faced with Plaintiff's request for a raise in March 1998, Defendant provided

Plaintiff – an African-American Protestant – with a raise of 3.05%, raising her salary by $0.44 to

$15.14 per hour on a forty (40) hour work week. *Id.* (citing Pl.'s Opp'n, Ex. 26 (3/23/98 Johnson

Personnel Action Form)).  Plaintiff contends that this 3.05% raise, when compared to the raise

provided to Reddin, was obviously discriminatory and "the result of favoritism because of

[Reddin's] religon and/or skin color," as "[w]ith this increase Ms. Johnson would earn $31,491.20 –

$7,008.80 less than Mr. Reddin – for performing duties as significant and difficult as Reddin." *Id.*

(citations omitted).

1.       Plaintiff Cannot Establish a *Prima Facie* Case of Discrimination With
         Respect to Her Salary Claims

To establish a *prima facie* case on a claim of disparate-treatment discrimination under the

Title VII framework, Plaintiff must show that:  (1) she is a member of a protected class; (2) she

suffered an adverse employment action; and (3) she was treated differently from similarly-situated

employees outside the protected class.  *See Mitchell v. Baldrige*, 759 F.2d 80, 84 (D.C. Cir. 1985);

*Douglas v. Pierce*, 707 F. Supp. 567, 571 (D.D.C. 1988), *aff'd*, 906 F.2d 783 (1990); *cf. Stella v.

Mineta*, 284 F.3d 135, 145 (D.C. Cir. 2002) (quoting *Brown v. Brody*, 199 F.3d 446, 452 (D.C.

Cir. 1999)); *Charles v. Nat'l Rehab. Hosp.*, Civ. No. 94-0171, 1994 WL 874211, at *5 (D.D.C.

Sept. 29, 1994); *Childers v. Slater*, 44 F. Supp. 2d 8, 18 (D.D.C. 2000), *vacated in part on other

grounds*, 197 F.R.D. 185, 191 (D.D.C. 2000).

In this case, it is clear that Plaintiff has met the first prong of the *prima facie* case for her

disparate treatment racial discrimination claim – she is an African-American, and therefore a

member of a protected class.  An interesting question is posed as to whether Plaintiff's religion

(Protestant) puts her into a protected class for the purposes of her Title VII religious disparate

treatment claim, given the fact that her religious affiliation places her within the plurality – if not

majority – of Americans.  *See* Tom W. Smith & Seokho Kim, <u>The Vanishing Protestant Majority</u>,

NORC/University of Chicago GSS Social Change Report No. 49 (July 2004) *available at*

http://www-news.uchicago.edu/releases/04/ 040720.protestant.pdf (finding that in the Year 2002,

52% of Americans identified themselves as Protestant, but that percentage was likely to fall below

50% by mid-decade).  Indeed, Plaintiff's case is also not a simple "reverse discrimination" claim

either, given the fact that (1) only approximately 17% of News World Communications employees

were members of The Unification Church during the time period relevant to this suit, meaning that a

minority religious group did not necessarily control Defendant's personnel actions and actually

remained a minority within the organization, *see* Pl.'s Opp'n, Ex. 19 (Spreadsheet Based on

10/1998 Staff Directory) (based on member lists and testimony, estimating that 110 of the 645

News World Communications employees listed in the staff directory were members of The

Unification Church); and (2) of the two decision-makers involved in the salary raise decision

process, one was a member of The Unification Church (Borer) while the other (Edwards) was not

and has never been a member of The Unification Church.  *See* Def.'s Stmt. ¶ 51; Pl.'s Resp. ¶ 51.

As such, this case is not necessarily similar to *Shapolia v. Los Alamos National*

*Laboratory*, 992 F.2d 1033 (10th Cir. 1993), a case in which the Tenth Circuit confronted a

plaintiff (a non-Mormon) who received a negative review from both his supervisor (a Mormon) and

the individual in charge of the administrative review proceedings (also a Mormon).  In *Shapolia*, the

Tenth Circuit applied a modified *McDonnell Douglas* test and found that "the use of the protected

class factor is inappropriate" in what was akin to a reverse-discrimination claim.  *Id.* at 1038 & n.6.

However, given that the stated goal of Title VII is that all personnel actions affecting employees

"shall be made free from any discrimination based on race, color, religion, sex, or national origin,"

42 U.S.C. § 2000e-16(a), and the context of Plaintiff's religion-based disparate treatment claim

bears a resemblance to *Shapolia*, the Court shall follow the path blazed by the Tenth Circuit and

essentially "assume away" this protected class requirement with respect to Plaintiff's religion-based

disparate treatment salary claim.  However, like the *Shapolia* court, the Court shall require that

Plaintiff "establish background circumstances that support an inference that the defendant is one of

those unusual employees who discriminates against the majority," *Shapolia*, 992 F.2d at 1038 n.6

(citation and quotation marks omitted).  Accordingly, the Court shall still examine whether Plaintiff

can show that Defendant's partial denial of her raise request constituted an adverse action <u>and</u>

whether or not similarly-situated employees were subjected to similar treatment.

With respect to the traditional second prong of the *prima facie* analysis, the "adverse employment action" requirement, Defendant in March 1998 clearly did not take an action that *decreased* Plaintiff's salary or benefits, or that negatively impacted her chances for promotion, affected her responsibilities, or changed her workload.  Indeed, Defendant actually *increased* Plaintiff's salary by 3.05% – a significant amount, although less than Plaintiff had requested.  While it is not necessarily self-evident that providing an individual with an added benefit (a raise) that fell below their expectations is an "adverse action" for the purposes of Title VII, the Court will assume for the purposes of Defendant's motion that Defendant's failure to completely meet Plaintiff's raise request was an "adverse action," given (1) Defendant's failure to address this issue, (2) the fact that a salary alteration was at issue, and (3) the recent decision by the D.C. Circuit in *Rochon v. Gonzales*, --- F.3d ----, 2006 WL 463116, at *4-*8 (D.C. Cir. Feb. 28, 2006), that suggests a more expansive reading of the "adverse action" requirement is appropriate.  As such, because Plaintiff has met – or the Court has assumed that Plaintiff has met – the first two prongs of the "adverse action" requirement, the Court shall proceed to the third requirement, which involves a comparison of the treatment encountered by Plaintiff to that afforded to similarly-situated employees.

Plaintiff's disparate treatment salary claim wilts on the *prima facie* vine due to her inability to meet the third prong of the relevant test – the "similarly situated" requirement.  With respect to this prong, Plaintiff must identify an employee outside her class who was similarly situated to her, but afforded more favorable treatment.  *See Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1514 (D.C. Cir. 1995).  Plaintiff is unable to meet this requirement.

Importantly, Reddin – the white male Unification Church member whose salary was increased to $38,500 and who was provided with a $1,500 educational stipend – is not an

42

appropriate comparator to Plaintiff and was not similarly situated to her.[8]  While Plaintiff asserts

that "Mr. Reddin was similarly situated in that he was an administrative employee of the Human

Resources Department," Pl.'s Opp'n at 12, Plaintiff neither provides record evidence to support her

conclusory allegation, nor makes any attempt to analyze the way in which Reddin's duties and

responsibilities as a Benefits Specialist compared to her own duties as the HRIS Specialist.  To show

that someone was "similarly situated" to her, Plaintiff "is required to demonstrate that all of the

relevant aspects of her employment situation were 'nearly identical'" to that of her comparator,

Reddin.  *Neuren*, 43 F.3d at 1514 (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796,

802 (6th Cir. 1994)); *see also Mungin*, 116 F.3d at 1554 (same); *Dickerson v. Secteck, Inc.*, 238

F. Supp. 2d 66, 77 (D.D.C. 2002) (same); *Byrd v. Ronayne*, 61 F.3d 1026, 1032 (1st Cir. 1995)

("A disparate treatment claimant bears the burden of proving that she was subjected to different

treatment than persons *similarly situated 'in all relevant aspects.'*") (citation omitted) (emphasis in

original).  To satisfy her burden of proof, Plaintiff must do more than simply identify a person

outside of her protected class or religious group who received different treatment.  Instead, she must

point to evidence that would meet her burden to show, by a preponderance of the evidence, *see St.*

*Mary's Honor Ctr.*, 509 U.S. at 506, 113 S.Ct. 2742, that all of the relevant aspects of Reddin's

employment situation were "nearly identical" to the aspects of her employment at The Washington

Times.

Plaintiff has not made this showing; rather, a review of the record adduced during discovery

plainly reveals that not only did Reddin have a different job title and position than Plaintiff, he also

---

[8] As noted previously, Plaintiff testified during her deposition that the salary ultimately awarded to Reddin in 1998 was appropriate and fair given his level of responsibility.  She simply complains that the difference in the percentage raise awarded to Reddin as compared to the percentage raise awarded to her was unfair.  *See* Def.'s Stmt. ¶ 82; Pl.'s Resp. ¶ 82.

had very different duties and responsibilities, including the duty of overseeing benefits plans with an estimated value in excess of $3 million, and a different level of experience.  *See* Def.'s Stmt. ¶¶ 55, 71, 72; Pl.'s Resp. ¶¶ 55, 71, 72; Def.'s Mot. for Summ. J., Ex. 9 (7/10/01 Borer Dep.) at 238:1-6 (explaining that Plaintiff, Palmer, and Reddin all had "three different jobs"); *see also* Def.'s Mot. for Summ. J., Ex. 38 (Pl.'s Resp. to Def.'s Interrogs.) at Answer No. 3 (identifying Reddin as someone who received more favorable treatment without explaining how he qualifies as a valid comparator to her).  Because Plaintiff has adduced no evidence to show that Reddin was similarly situated to her other than the fact that he happened to work in the same department at the newspaper, Plaintiff has failed to meet the necessary third prong of the *prima facie* analysis to sustain her disparate treatment claim.  *See Mungin*, 116 F.3d at 1554 (noting that the plaintiff, an African-American associate at a law firm, failed to show how the white associates that he compared himself to were similarly situated); *Dickerson*, 238 F. Supp. 2d at 77 (finding that plaintiff, a female, failed to produce any evidence that male employees with similar responsibilities were treated more favorably).

> 2.  Assuming *Arguendo* that Plaintiff Could Meet the *Prima Facie* Test, Defendant Had Legitimate, Non-Discriminatory Reasons for Awarding Her a 3.05% Raise, Rather than the Raise She Desired

Even assuming *arguendo* that Plaintiff could establish a *prima facie* case of disparate treatment based on her race and religion with respect to her March 1998 raise request, Defendant has clearly met its burden of production under the *McDonnell Douglas* test by offering a legitimate, non-discriminatory reason for its decision to award Plaintiff only a 3.05% raise, rather than the raise that she desired.

According to Borer, Plaintiff's supervisor at the time of her March 1998 raise request, he decided to award Plaintiff a 3.05% raise that would take effect in March 1998 despite the fact that –

under normal procedures – her next performance review and raise (if any) was not to be conducted for another five months.  *See supra* Section II(C) (Chart showing that from 1993-1997, Plaintiff received any salary increase in the month of August, and Plaintiff had just seen her salary increased on August 19, 1997).  Borer testified that he made his decision vis-á-vis Plaintiff's raise request based on his personal assessment that:  (1) Plaintiff was adequately paid; (2) a raise of 3.05% was adequate; and (3) the raise he advocated and ultimately awarded Plaintiff was more than anyone else had in mind for her.  Edwards, The Washington Times' General Manager who has not and has never been a member of The Unification Church, actually was not initially keen on any raise for Plaintiff, but ultimately agreed with Borer's recommendation.  Borer also noted that when he made his decision regarding Plaintiff's compensation, he did so based on his own assessment of Plaintiff, her subordinates, and her position, duties, and responsibilities.  Accordingly, Defendant has met its burden under the tripartite *McDonnell Douglas* and provided evidence suggesting that neutral, non-discriminatory reasons were behind its employment decision affecting Plaintiff's raise.

With respect to Reddin, Defendant also offered numerous, non-discriminatory reasons why he received a raise larger than that given to Plaintiff.  In early 1998, Reddin lobbied for a raise by submitting three separate memos to his superiors.  In these memoranda, Reddin outlined his various bases for requesting a raise, and included a threat to resign from his position if his expectations were not met by the newspaper.  *See* Def.'s Mot. for Summ. J., Ex. 15 (1/19/98 Reddin Memo to Dong Moon Joo); *id.*, Ex. 16 (2/12/98 Reddin Memo to Edwards); *id.*, Ex. 17 (3/4/98 Reddin Memo to Dong Moon Joo) (announcing resignation effective 3/18/98).  Reddin contended that he was entitled to a raise because, *inter alia*, he had saved the company millions of dollars by negotiating lower rates from its insurance carriers.  *Id*.  Moreover, Reddin made the case that he had extensive duties and responsibilities with significant financial consequences for the newspaper, including

45

administering the budget for benefits of roughly $3 million and administering all of the benefit plans

having to do with the health care, the newspaper's cafeteria plan, and the newspaper's pension and

401(k) plans. *Id.* A review of his memoranda indicates that Reddin presented the case that he held

a particularly important position as the Benefits Specialist, worthy of pay substantially greater than

he had received over the previous years and necessary to sustain his position as his family's sole

breadwinner. *Id.*

Unlike Plaintiff, Reddin also took the additional, persuasive step of drafting a new, detailed

job description highlighting his responsibilities for administering the newspaper's multi-million

dollar benefit plans. *See* Pl.'s Resp. ¶ 70 (contending that "Defendant provides no record evidence

that the attached Job Description was prepared by Mr. Reddin . . . ."); *but see* Def.'s Mot. for

Summ. J., Ex. 18 (1/16/98 Reddin Job Description) ("Prepared by: Les Don Reddin"); *id.*, Ex. 1

(Borer Aff.) ¶ 12 ("That which is attached hereto to [sic] the Statement as Exhibit 18 is a true and

accurate copy of a proposed job description submitted by Les Reddin to me in response to my

request that he prepare and provide such a job description."). Fully cognizant of these facts, Borer

and Edwards carefully considered Reddin's requests – and threats of resignation. In the course of

doing so, Edwards, with over thirty (30) years of experience on a newspaper, formed the opinion that

Reddin deserved not just one but two raises based on his Reddin's responsibilities for supervising the

administration of the newspaper's multi-million dollar benefit plans. Borer, as Reddin's immediate

supervisor, also considered Reddin's request and concluded that he would recommend Reddin's

requested raises based on (1) his personal assessment that Reddin had a great deal of responsibility

as the Benefits Specialist, and (2) his analysis, using a salary survey provided by Employment

Specialist Palmer, that showed Reddin to be underpaid compared to his cohorts at other companies.

Accordingly, given that Defendant has offered neutral, non-discriminatory reasons for its decision to

award Plaintiff a raise of 3.05%, rather than a larger increase like the one provided to Reddin,

Defendant has satisfied its burden of production and the burden shifts back to Plaintiff to introduce

evidence sufficient that a fact-finder could find that she suffered an adverse employment action for

discriminatory reasons through an examination of Plaintiff's *prima facie* case, evidence introduced

to show that Defendant's explanations were pretextual, and any further evidence of discrimination

by Defendant. *See Waterhouse v. Dist. of Columbia*, 298 F.3d 989, 992-93 (D.C. Cir. 2002).

### 3.   Plaintiff Has No Evidence to Show Pretext or Discrimination *Vel Non.*

Upon an examination of Plaintiff's *prima facie* case, any evidence in the record to show that

Defendant's explanations were pretextual, and any further evidence of discrimination by Defendant,

it is clear that no reasonable fact-finder could conclude that Defendant awarded Plaintiff a raise of

3.05% in March 1998 – rather than her larger request – for discriminatory reasons based on her race

or religious affiliation.  Accordingly, an award of summary judgment in favor of Defendant as to

Counts I, IV, and VII of Plaintiff's Complaint is appropriate.

First, as noted *supra* Section III(A)(1), Plaintiff's *prima facie* case framing her claims of

race and religion-based discrimination is incomplete and inadequate.  While the Court has assumed

or Plaintiff has proven that she is a member of a protected class, her claims of having suffered an

"adverse employment action" are quite weak, given that Plaintiff herself was presented with a salary

*increase* in March 2005.  Plaintiff herself in her deposition admitted under oath that she did not

believe that she suffered discrimination in those years when The Washington Times had presented

her with what was essentially only a cost-of-living increase.  *See* Def.'s Mot. for Summ. J., Ex. 3

(6/25/01 Johnson Dep.) at 80:1-4 (Plaintiff clarifies that she only claims discrimination vis-á-vis her

1998 salary request, and does not claim that she was discriminated for "the years when [she] got

cost of living raises").  In August 1993 through August 1997, Plaintiff received cost of living raises

47

each year ranging from 2.00% to 3.85%. *See supra* Section II(C) (Chart showing that from 1993-

1997, Plaintiff received any salary increase in the month of August, and Plaintiff had just seen her

salary increased on August 19, 1997). Edwards, the paper's General Manager who was not a

Unification Church member, acceded to providing Plaintiff with a raise at the unusual time of March

1998 when he became convinced that it basically represented a cost-of-living increase. *See* Def.'s

Mot. for Summ. J., Ex. 12 (9/26/01 Edwards Dep.) at 57:13-22 ("[t]he 3 percent – if [Plaintiff] got

3 percent, it was adequate . . . because that's the sort of semi-cost of living arrangement.").

Therefore, given that Plaintiff had never previously complained of cost-of-living increases, her

March 1998 raise was another cost-of-living increase after her August 1997 raise, and her salary

was actually *increased*, Plaintiff's claim of an "adverse employment action" is not strong.

However, her ability to meet the *prima facie* "similarly-situated" employee requirement is

nonexistent; as the Court has noted, Reddin simply is not an adequate comparator to Plaintiff given

the vast differences in their positions, responsibilities, experience, and duties. *See supra* Section

III(A)(1). According, given that Plaintiff cannot meet the *prima facie* requirements due to her

inability to meet the third prong of the applicable test, summary judgment in Defendant's favor is

appropriate. Even assuming *arguendo* that Plaintiff could make such a showing, her overall *prima*

*facie* case for race and religion-based discrimination would be quite weak.

Second, to the extent that the Court considers pretext under the *McDonnell Douglas*

analysis, Plaintiff simply has presented no evidence indicating that Defendant's stated reasons for

awarding Plaintiff and Reddin their respective raises are pretextual. Under a pretext analysis,

Plaintiff may think that Defendant's decision with respect to her raise request was not fair, but it

does not matter if the decision was "'not just, or fair, or sensible.'" *Carter v. Greenspan*, 304 F.

Supp. 2d 13, 28 (D.D.C. 2004) (quoting *Fischbach*, 86 F.3d at 1183); *Dickerson*, 238 F. Supp. 2d at 82 n.14 ("An employer's proffered explanation for its adverse action need not be one that is desirable or attractive."); *see also Pignato v. Am. Trans Air, Inc.*, 14 F.3d 342, 349 (7th Cir. 1994) (same).  Rather, Plaintiff must show that Defendant's "'explanation given is a phony reason.'" *Id.*; *see also Fischbach*, 86 F.3d at 1183 ("the issue is not the correctness or desirability of the reasons offered . . . but whether the employer honestly believes in the reasons it offers").  While Plaintiff might cry foul that Defendant refused to give her exactly what she wanted, she must adduce evidence showing that its stated reasons – whether fair or ill-considered – were actually a pretext covering up race-based or religious-based motivations.  *See Hollins v. Fed. Nat'l Mortgage Ass'n*, 760 A.2d 563, 571 (D.C. 2000).

Plaintiff attempts to demonstrate pretext by focusing on the difference in religious affiliation between herself and Borer, and the connections between The Washington Times and The Unification Church.  *See* Pl.'s Opp'n at 2-3.  In many respects, Plaintiff's argument boils down to a claim that Borer's membership in The Unification Church (leaving aside the fact that Borer testified that he is also a member of the Catholic Church) – to which she does not belong – demonstrates that he discriminated against her on the basis of her religion.  Plaintiff's contention is utterly inadequate to demonstrate pretext.  *See Shapolia*, 992 F.3d at 1039 (noting that "there mere fact that one Mormon supervisor reviewed another Mormon supervisor's performance appraisal of a non-Mormon employee is not sufficient to raise an inference of discrimination").  Indeed, the evidence adduced during discovery shows that the only individual who advocated a raise for Plaintiff was Borer, a member of The Unification Church, while Edwards, who was never a member of The Unification Church, initially opposed Plaintiff's request and then acceded reluctantly.  Further, simply stating that The Unification Church has a connection to The Washington Times and 17% of

49

Washington Times employees during the relevant time period were members of The Unification is

insufficient to raise an inference of pretext.  *See id.* ("Shapolia's mere assertions that the Mormons

are 'clannish' and his own assessment of his job performance are inadequate to raise an issue of fact

for trial.").

Moreover, Plaintiff has presented no documentary evidence or testimony suggesting that

Borer, Reddin, or Joo ever referred to or considered her race or religious affiliation when making the

March 1998 decision to award her a 3.05% promotion.  While Borer himself might have been able

to uncover whether or not Plaintiff was a member of The Unification Church through a reference to

a variety of church materials at his home, Plaintiff has presented no evidence that Defendant ever

obtained or kept information regarding the religious affiliation or non-affiliation of its employees.

Indeed, Plaintiff – who served in its Human Resources Department for over nine (9) years – would

have been in a prime position to have known of such a practice, but she provides no evidence

showing that such knowledge was ever gleaned from the paper's employees.  Additionally, the fact

that Plaintiff is African-American while Borer and Edwards a white is also insufficient to raise an

inference of racial-discrimination.  Plaintiff has presented no evidence whatsoever connecting

Defendant's raise decision to her race.  Finally, Plaintiff's unfounded attempt to compare herself to

Reddin further weakens her claim of pretext.  *See Dickerson*, 238 F. Supp. 2d at 78 ("[This] Circuit

has held that a plaintiff's attempts to show that her employer's explanation is a pretext for

discrimination are seriously undermined if those to whom she compares her treatment are not

similarly situated.") (citing *Waterhouse*, 298 F.3d at 995-96 and *McGill v. Muñoz*, 203 F.3d 843,

848 (D.C. Cir. 2000)).  Because Plaintiff has failed to provide evidence suggesting that Defendant's

stated reasoning behind its award of her March 1998 salary increase was pretextual, her case is

severely weakened, if not fatally wounded.  *See Forman v. Small*, 271 F.3d 285, 293-94 (D.C. Cir.

2001), *cert. denied*, 536 U.S. 958, 122 S.Ct. 2661, 153 L.Ed.2d 836 (2002) (affirming dismissal of

age discrimination claim where plaintiff failed to show that defendant's reasons for denying his

promotion were pretextual); *Mungin*, 116 F.3d at 1154, 1158 (overturning jury verdict where

plaintiff failed to show that employer's explanation for his treatment was pretextual, or that

similarly-situated colleagues were treated more favorably).

Finally, a consideration of other evidence regarding Defendant's potential discrimination

undermines Plaintiff's claims of race and religion-based discrimination during the consideration of

her March 1998 raise request.  It is noteworthy that in alleging disparate treatment based on race

and religion, Plaintiff has focused exclusively on Reddin.  While both Reddin and Plaintiff requested

and received raises for their work in the Human Resources Department of The Washington Times,

so did another individual – Sherrie Palmer.  Palmer (1) was also an "administrative employee" in

the Human Resources Department (the Employment Specialist); (2) she, like Plaintiff, is African-

American; (3) she, like Plaintiff, was not and has never been a member of The Unification Church;

and (4) she was awarded a substantial raise in March 1998 that resulted in her earning the *exact*

same base salary as Reddin ($38,500) and the same $1,500 educational stipend.  *Compare* Def.'s

Mot. for Summ. J., Ex. 21 (Personnel Action Form for Sherrie Palmer) *with id.*, Ex. 22 (Personnel

Action Form for Les Reddin); *see also* Def.'s Stmt. ¶¶ 87, 89; Pl.'s Resp. ¶¶ 87, 89.  As such, at the

same time Plaintiff was requesting a raise, Defendant chose to provide another African-American

non-Unification Church member in the same department as Plaintiff with a substantial salary

increase that brought her pay exactly into line with Reddin, the individual so focused on by Plaintiff.

Notably, Plaintiff never complains about the sizable increase provided at the same time to her friend

Palmer.  *See* Def.'s Stmt. ¶¶ 87, 89; Pl.'s Resp. ¶¶ 87, 89 (Palmer's pay from March 1998 forward

would have been 15% over Palmer's prior year's base salary).  Plaintiff's neglect of this issue is

telling, as Defendant's decision with respect to Palmer highlights the plethora of evidence in the record suggesting that it did <u>not</u> use race or religion-based criteria in determining its employees' salaries or raises.

Ultimately, Plaintiff is unable to sustain a *prima facie* case of race and religion-based discrimination.  Plaintiff also has no evidence suggesting that Defendant's stated reasons were pretextual; rather, the record is inundated with evidence suggesting that Borer believed, in good faith, that Plaintiff was adequately paid and that her 3.05% raise was also adequate in his view. Finally, other evidence in the record relating to Ms. Palmer highlights the non-discriminatory aspects of Defendant's decision-making process.  Accordingly, Counts I, IV, and VII of Plaintiff's Complaint, alleging race and religion-based discrimination with respect to her March 1998 raise, cannot survive Defendant's Motion for Summary Judgment.

B.      *Plaintiff's Claims Arising From Her October 1998 Termination*

Plaintiff's claims arising from her October 29, 1998 termination from The Washington Times may be divided into two (2) central categories.  First, Plaintiff contends that Defendant's decision to terminate her employment was founded upon race and religious-based discrimination in violation of the DCHRA, Title VII, and 42 U.S.C. § 1981.  *See* Compl. ¶¶ 17-20 (Count II – DCHRA), ¶¶ 29-32 (Count V – Title VII), ¶¶ 41-44 (Count VIII – Section 1981 Claim).  Second, Plaintiff claims that her termination was the result of retaliation against her following her April 24, 1998 EEOC Charge (which was focused on her salary/raise claim) in violation of the DCHRA, Title VII, and 42 U.S.C. § 1981.  *See id.* ¶¶ 21-24 (Count III – DCHRA), ¶¶ 33-36 (Count VI – Title VII), ¶¶ 45-48 (Count IX – Section 1981 Claim).  The Court shall investigate each category of claims *seriatim*, first addressing Plaintiff's discrimination claims and then examining Plaintiff's retaliation claims.

1.      Plaintiff's Discriminatory Termination Claims

Counts II, V, and VIII of Plaintiff's Complaint allege that Plaintiff's "termination

constituted religious and/or racial discrimination" when Plaintiff "was replaced by a Caucasian,

Unification Church Member" as HRIS Specialist at The Washington Times – Elizabeth Henkin.

Pl.'s Opp'n at 29.  While the Court concludes that Plaintiff has made out a *prima facie* case of race

and religion-based discriminatory termination, the Court concludes that –  when looking at the

strength of Plaintiff's *prima facie* case, Defendant's neutral, non-discriminatory rationale for

terminating Plaintiff, Plaintiff's failure to produce evidence indicating pretext, and other relevant

evidence in the record – no reasonable fact-finder could conclude that Plaintiff suffered the adverse

employment action for a discriminatory reason.  *See Aka*, 156 F.3d at 1289.

i.      *Plaintiff Can Establish a Prima Facie Case of Discriminatory*
        *Termination*

To make out a *prima facie* case of discriminatory termination under the Title VII

framework, a plaintiff must show that: (a) "she belongs to a protected class"; (b) "she was qualified

for the job from which she was terminated"; (c) "her termination occurred despite her employment

qualifications"; and (d) "her termination was based on the characteristic that placed her in the

protected class."  *McManus v. MCI Commc'ns Corp.*, 748 A.2d 949, 954 (D.C. 2000); *see also*

*Neuren*, 43 F.3d at 1512.  To satisfy the fourth of these elements, the plaintiff must show either: (i)

that "'she was replaced by a person outside of her protected class, or if the position has remained

vacant, that the employer has continued to solicit applications for the position'"; or (ii) "'that other

similarly situated employees . . . were not terminated but were instead treated more favorably.'"  *Id.*

(quoting *Blackman v. Visiting Nurses Ass'n*, 694 A.2d 865, 868-69 (D.C. 1997)).  "The

requirement of showing that similarly situated employees were treated more favorably is imposed

when a plaintiff has not alleged that someone replaced her when terminated." *Id.* This *prima facie*

framework is applicable for both Plaintiff's race-based termination claims and her religion-based

termination claims. *See Klein v. Derwinski*, 869 F. Supp. 4, 8 (D.D.C. 1994) ("[W]here the

religious discrimination involves termination rather than failure to accommodate, the case 'more

closely approximates those straight-forward disparate treatment cases in which the plaintiff claims

that she was terminated because of her sex or race.'") (quoting *Shapolia*, 992 F.2d at 1037). If the

plaintiff succeeds in establishing the *prima facie* case, the traditional *McDonnell Douglas*

framework then runs its course. *See Neuren*, 43 F.3d at 1512.

Defendant attacks Plaintiff's ability to meet two out of the four prongs necessary to make a

*prima facie* showing of discriminatory termination. First, Defendant contends that Plaintiff cannot

meet the second prong, requiring that she was qualified for the job when terminated, because her job

performance was deficient in significant respects – namely, Plaintiff knowingly breached the paper's

confidentiality policy on numerous occasions, refused to cooperate with Borer's requests for

information to be provided to his secretary, admittedly responded to her co-worker Reddin in an

unprofessional manner, and refused to cooperate or answer questions relating to an investigation into

breaches of confidentiality. *See* Def.'s Mot. for Summ. J. at 31-33; Def.'s Reply at 16-18. Second,

Defendant claims that Plaintiff cannot meet the fourth prong of the analysis, requiring that Plaintiff

introduce evidence that would support an inference and jury finding that Borer terminated her

employment because she was not affiliated with The Unification Church. *See* Def.'s Mot. for

Summ. J. at 34; Def.'s Reply at 16-18. Both arguments are without merit.

With respect to the qualification prong of the *prima facie* test, courts have generally been

unwilling to use a defendant's alleged legitimate, non-discriminatory reason(s) to terminate a

plaintiff to support a finding that the plaintiff was "unqualified," thereby defeating the plaintiff's

claims at the *prima facie* stage. *See Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 662 (6th

Cir. 2000) (noting that the defendant's qualifications argument "should have instead been treated as

its production of a nondiscriminatory reason" and "[t]o assess this evidence at the prima facie stage

is to misapply legal rules governing the allocation of burdens and order of proof"); *Damon v.*

*Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1360 (11th Cir. 1999), *cert. denied*, 529

U.S. 1109, 120 S.Ct. 1962, 146 L.Ed.2d 793 (2000) (explaining that "based on [plaintiffs']

employment history . . . we can infer that they were qualified for their respective positions" and

holding that in finding the plaintiffs unqualified, the district court "incorrectly considered" the

defendant's allegations of their "poor performance"); *Miners v. Cargill Commc'ns, Inc.*, 113 F.3d

820, 823-24 & n.6 (8th Cir. 1997) (holding that a defendant's proffer of a legitimate, non-

discriminatory reason for its action does not prevent the plaintiff from establishing a *prima facie*

case); *Thomas v. Denny's, Inc.*, 111 F.3d 1506, 1510-11 (10th Cir. 1997), *cert. denied*, 522 U.S.

1028, 118 S.Ct. 626, 139 L.Ed.2d 607 (1997) (in order to avoid the frustration of Plaintiff's ability

to establish pretext, "the employer's subjective reasons are not properly considered at the prima facie

stage, and should instead be considered in addressing whether those articulated reasons are

legitimate or merely a pretext for discrimination") (citation and quotation marks omitted); *Freeman*

*v. Package Mach. Co.*, 865 F.2d 1331, 1335-36 (1st Cir. 1988) (same).  An analysis of the

evidence adduced during discovery reveals that – at the time of Plaintiff's salary request in March

1998 and her termination in October 1998 – Plaintiff was in fact "qualified" for the HRIS Specialist

position at The Washington Times.  Not only did Plaintiff have nine (9) years of experience at the

newspaper, she also served her entire tenure in the Human Resources Department.  Throughout the

years prior to this request, Plaintiff had regularly received complementary performance evaluations,

and her most recent review stated, "Pam's work continues to be accurate, thorough and completed in

a dependable fashion." *Id.*, Ex. 16 (Johnson's 1997 Performance Evaluation); *see also id.*, Exs. 11-16 (1990, 1992, 1994, 1995, and 1996 Johnson Performance Evaluations).  Given these facts, the Court concludes that Plaintiff has made the requisite showing that she was "qualified" for the position from which she was terminated for the purposes of the *prima facie* analysis.  *See Paquin*, 119 F.3d at 27 (looking at the plaintiff's evidence, including her "twenty year tenure" and "series of promotions" prior to negative performance evaluations proffered by defendant to find that plaintiff had surpassed the *prima facie* stage).

Defendant's second argument, which asserts that Plaintiff cannot meet the fourth prong of the *prima facie* analysis because there is no record evidence that would support an inference that she was terminated based on a discriminatory motive, falls into a similar trap.  Once again, Defendant is introducing fact-based arguments at an inappropriate stage of the *McDonnell Douglas* analysis; instead, an argument that Plaintiff failed to present evidence "that would support an inference and jury finding that Borer terminated her employment because she was not affiliated with the Unification Church" or was not a Caucasian is proper at the third stage of the tripartite framework, not the first, *prima facie* stage.   Moreover, Defendant ignores the fact that the fourth prong of the *prima facie* case is satisfied if Plaintiff "'was replaced by a person outside of her protected class, or if the position has remained vacant, that the employer has continued to solicit applications for the position'" *McManus*, 748 A.2d at 954 (quoting *Blackman*, 694 A.2d at 868-69)); *see also Neuren*, 43 F.3d at 1512 ("replacement by a person of equal or less ability who is not a member of a protected class or, alternatively, the position remains open after termination").  Here, Plaintiff has presented evidence that less than one (1) month after her termination, her position as HRIS Specialist at The Washington Times was filled by Henkin, who is both Caucasian and a Unification Church member.  Accordingly, Plaintiff has met the requirement necessary to establish the fourth

prong of the *prima facie* test.  Because Defendant has not contested the remaining two prongs of the

analysis, the Court concludes that Plaintiff has met the *prima facie* case necessary to proceed with

the remainder of the traditional *McDonnell Douglas* framework with respect to her discriminatory

termination claims.

> ii.    *Defendant Has Offered Neutral, Non-Discriminatory Reasons for Plaintiff's Termination*

Upon a review of the evidence adduced during discovery and the parties' accompanying

legal arguments, it is clear that Defendant has met its burden of production to offer neutral, non-

discriminatory reasons for Plaintiff's termination.  As Borer testified, he alone made the decision to

terminate Plaintiff's employment with The Washington Times, after security breaches and violations

of confidentiality were constantly occurring in the Human Resources Department, there was reason

to suspect Plaintiff, and – in his opinion – Plaintiff failed to adequately respond to his questioning on

October 29, 1998.   According to Borer, at least eight (8) events led up to and culminated in the

termination of Plaintiff.

First, Reddin's computer had been accessed without authorization in the Spring of 1998.

After this event, Plaintiff submitted Reddin's three salary requests/demands from January-March

1998 in support of her April 24, 1998 EEOC Charge revolving around her raise request.  Borer

logically believed that Plaintiff was involved in improperly accessing Reddin's computer.

Second, Borer believed – based on what he considered to be an inordinate amount of

circumstances pointing to Plaintff – that she had given Howard the confidential "leave of absence"

documents that were present at Howard's October 8, 1998 deposition.  Borer based his belief,

whether accurate or not, on these facts:  (1) he was aware that Plaintiff and Howard were friends; (2)

since Howard had left her position unexpectedly in late 1996 and did not return as an employee,

there would be no way that she could have taken these documents before her departure; (3) Borer thought that only Reddin, Palmer, Martin, Plaintiff, and himself had access to these documents; (4) the personnel files were kept in Plaintiff's office and Plaintiff had access to them; (5) he found a "Post-It" note near the "leave of absence" files that appeared to be in Plaintiff's handwriting and contained the names of certain employees who had already returned from leave; (6) he found staples of Plaintiff's staple remover near the "leave of absence" files, which indicated to him that she had copied certain documents then stapled them back together; and (7) Borer was present on October 28, 1998 when Howard swore under oath that – at her request – Plaintiff and Palmer had agreed to take confidential "leave of absence" documents from The Washington Times to aid Howard's case.  In Borer's mind, this was an extremely serious offense, and his initial suspicions had apparently been confirmed.

Third, Borer found documents on Plaintiff's computer that contained confidential information from his personnel file – a file for which Plaintiff did not have access.  Borer believed that his personnel file had been tampered with, and Clarke shared that view.  Given that Plaintiff had access to this file because it was located in her office with the other files, coupled with other circumstances that Borer thought were suspicious, Borer once again suspected Plaintiff of breaching confidentiality guarantees.

Fourth, according to Borer, he became suspicious on October 28, 1998 that someone had been accessing his voice mail messages without permission.  Around this same time, he had suspected someone of improperly going through a file cabinet in his office because he found that the file cabinet – which he never locked because he did not have a key – had been locked during a period that he was away from his office.

Fifth, Borer had contemporaneous concerns that Plaintiff may have been providing confidential information to another Washington Times employee, Teague, who was pursuing a claim against the newspaper and her former supervisor.  Borer based this belief on his discovery that:  (1) he saw information about Teague's former supervisor on Plaintiff's computer screen with no believable explanation provided by Plaintiff; (2) Plaintiff's calendar apparently indicated that she was having lunch with Teague in mid-October 1998; and (3) he found a torn-up note in Plaintiff's trash basket with both contact information for Teague's attorney and what appeared to be a list of items that had been requested by Teague.  Borer felt that there would be no reason for Plaintiff to communicate with Teague or her attorney about Teague's case, and any contact by an attorney should have resulted in a referral to Clarke, the security manager.

Sixth, Borer also grew concerned that Plaintiff had provided confidential salary information to a new hire, essentially telling that new hire that she was receiving a lower salary than her predecessor.  Borer conducted an investigation of this incident, including an interview of the new hire, and found signs that he felt pointed to Plaintiff as the culprit, especially given the fact that – at this time – Palmer no longer worked in the Human Resources Department.

Seventh, at Howard's October 28, 1998 deposition, for which he was present, Borer also heard Howard testify under oath that Plaintiff had intentionally provided false information in response to an employment verification request for her – another breach of Plaintiff's employment obligations.

Eighth, and finally, Borer knew that Plaintiff had been the subject of two complaints lodged by Reddin, in which Reddin claimed that Plaintiff had told him to "shut up" and get out of a work area, and then referred to him using the "f-word" during a phone call discussing her run-in with Reddin.  When he attempted to investigate these incidents, Borer felt that Plaintiff was less than

cooperative.

Based on the culmination of these circumstances and suspicions, especially the events that occurred in the last month or two of Plaintiff's employment (after Palmer's resignation), Borer found himself with grave doubts about whether he could trust Plaintiff to be loyal to the company and fulfill her duty to maintain confidentiality. Accordingly, he wanted to meet with Plaintiff at the first possible opportunity, which presented itself during her planned meeting with Clarke on October 29, 1998. Borer went into the meeting with Plaintiff seeking to investigate security breaches, leaks, and the misuse of confidential information; in short, Borer sought to investigate actual and suspected wrongdoing in the Human Resources Department. Concerned the Plaintiff would not provide adequate answers to his questioning, would admit guilt, or would refuse to cooperate, Borer prepared a brief termination memorandum prior to the meeting. During the questioning, Borer believed that Plaintiff was evading his questions and refusing to answer necessary follow-up questions, an observation with which Clarke concurred. Viewing this as the ultimate confirmation of his suspicions and the opposite reaction of an innocent person, Borer terminated Plaintiff on the spot. As Plaintiff admitted during testimony, if someone in the Human Resources Department had breached the guarantee of confidentiality, that person was subject to termination. Based on the evidence before him, Borer believed that Plaintiff committed such a breach.

Given the testimony of Borer, the supporting observations of Clarke, the deposition admissions of Howard, and the documentary evidence in the record, it is clear that Defendant has met its burden of production under the *McDonnell Douglas* analysis and has provided numerous neutral, non-discriminatory justifications for Plaintiff's termination. According, Plaintiff must adduce evidence – using her *prima facie* case, evidence indicating pretext, and other support record evidence – that would allow a reasonable fact-finder to find that Defendant discriminated against her

on the basis of her race or religion when she was terminated from its employ on October 29, 1998.

iii.     *Plaintiff Cannot Show Pretext, and No Additional Evidence Indicates Impermissible Discriminatory Motivation*

Plaintiff spends virtually her entire argument attempting to show that Borer's stated reasons for her termination were pretextual.  *See* Pl.'s Opp'n at 16-28.  As discussed previously, pretext may be established "by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089.  The Court may also "consider the evidence establishing the plaintiff's *prima facie* case and inferences properly drawn therefrom on the issue of whether the defendant's explanation is pretextual."  *Reeves*, 530 U.S. at 143, 120 S.Ct. 2097 (citation and internal quotations omitted).  However, as noted, "[i]t is not enough for the plaintiff to show that a reason given for a job action is not just, or fair, or sensible." *Fischbach*, 86 F.3d at 1183.  Courts are without authority to "'second guess an employer's personnel decision absent demonstrably discriminatory motive.'" *Id.* at 118 (quoting *Milton v. Weinberger*, 696 F.2d 94, 100 (D.C. Cir. 1982)).  "Consistent with the courts' reluctance to become involved in micromanagement of everyday employment decisions, the question before the court is limited to whether [plaintiff] produced sufficient evidence of . . . discrimination, not whether [s]he was treated fairly . . . ." *Forman*, 271 F.3d at 291 (citations omitted); *see also Fischbach*, 86 F.3d at 1183 ("He must show that the explanation given is a phony reason.").  The relevant question at this stage is not whether Plaintiff actually committed the actual offenses for which she was under suspicion by Borer; rather, the pertinent inquiry becomes whether Borer believed – in good faith – that Plaintiff had violated the newspaper's confidentiality policy on numerous occasions, had been uncooperative and insubordinate, and could not longer be trusted, or whether discrimination based on Plaintiff's race and religious affiliation was the actual motivation for his decision.

61

Plaintiff, attempting to show pretext, makes four basic arguments, each of which are without merit. First, Plaintiff claims that "there is no way that Mr. Borer could have terminated" her on certain bases "since he had not determined that she had done anything wrong" prior to the October 29, 1998 meeting. *See* Pl.'s Opp'n at 24-28. In making this argument, Plaintiff takes excerpts from Borer's deposition out of context. While it is true that Borer testified that he had not definitively *concluded* prior to the meeting that Plaintiff had accessed Reddin's computer, revealed confidential "leave of absence" documents to Howard, provided false employment verification information to Howard, released salary information to the new hire, or had engaged in wrongdoing in connection with Reddin's complaints, *see id.*, Borer consistently testified that he was investigating these matters with Plaintiff as a prime suspect and he "wanted to question her about [them] in some detail so [he] could form an opinion of her credibility and what processes may have happened," *see, e.g.*, Pl.'s Opp'n, Ex. 3 (7/10/01 Borer Dep.) at 88:20-23. Plaintiff's argument is specious: while Borer might not have been able to say that – prior to the meeting – he had concluded that Plaintiff was guilty of these offenses beyond a reasonable doubt, all evidence suggests that he certainly had significant suspicions in advance of the meeting such that he drafted a brief termination memorandum that actually detailed his finding of Plaintiff's guilt and which he was prepared to give her, depending on the quality of her responses to his investigation.

Second, Plaintiff attempts to show that Borer has provided "shifting explanations" for discharging her because his October 29, 1998 termination memorandum does not mention her refusal to answer his questions, while at the EEOC stage he claimed that "[b]ecause Ms. Johnson refused to answer my questions, she was terminated[.]" *See* Pl.'s Opp'n at 16-17, 19, 21 (citing Pl.'s Opp'n, Ex. 68 (10/26/99 Borer EEO Aff.) at 2); *see id.* at 23 (citing *Ferguson v. Small*, 225 F. Supp. 2d 31, 40 (D.D.C. 2002) (holding that conflicting explanations given for termination are

62

sufficient to "raise a reasonable inference that defendant's proffered reasons for the termination are pretextual")). Plaintiff's semantic argument fails for multiple reasons. First, the termination memorandum drafted by Borer and provided to Plaintiff neither states nor implies that it contains every reason for or incident leading up to her dismissal. *See* Pl.'s Opp'n, Ex. 61 (Borer's 10/28/98 Note re: "Employment" to Johnson) at 1 ("Several incidents have occurred *including* . . . .") (emphasis added). Additionally, it is undisputed that Borer actually questioned Plaintiff on October 29, 1998 and provided her with the termination memorandum only after a period of approximately fifteen (15) minutes of questioning. Plaintiff's argument might be sustainable had Borer never questioned her and now claimed that she was terminated for failing to respond appropriately; however, all evidence in the record supports Borer's testimony that he suspected Plaintiff of certain offenses, questioned her, and then – finding her responses inadequate, evasive, and indicative of guilt – concluded that providing her with the termination memorandum and firing her was the necessary next step. Moreover, for Plaintiff to suggest that the termination memorandum should include "failure to answer questions" is to request the impossible; it is undisputed that Borer drafted the memorandum prior to the termination meeting, and therefore Borer could not be expected to note Plaintiff's subsequent refusal to cooperate in the memorandum. Finally, Plaintiff takes Borer's EEO Affidavit statement completely out of context in her effort to draw a distinction between Borer's "refusal to answer questions" reason and his other justifications. Borer's EEO Affidavit instead supports his testimony that he long suspected Plaintiff of multiple offenses and her failure to answer questions apparently confirmed his suspicions. In relevant part, his EEO Affidavit states:

> With regard to Ms. Johnson, it was discovered that she gave another employee, Sheletha Howard, confidential personnel information. Ms. Howard was suing the company at the time and the information she had was confidential. Ms. Howard was deposed on October 8 and October 28, 1998. Ms. Howard initially said she got the information anonymously but later changed her story to say that Ms. Johnson gave

her the information.  Ms. Johnson denies giving any information to anyone.  On
October 23, 1998, I had evidence and suspicion that Ms. Johnson was copying
documents and disclosing them to people suing the company.  I saw the name of an
employee on Ms. Johnson's screen who is a defendant in a case against the company.
I later confronted Ms. Johnson about this information.  Ms. Johnson accused me of
harassing her and refused to answer my questions.  Because Ms. Johnson refused to
answer my questions, she was terminated[.]

Pl.'s Opp'n, Ex. 68 (10/26/99 Borer EEO Aff.) at 2.  As such, this entire aspect of Plaintiff's pretext

argument is grounded in the distortion of the record evidence.  Borer has been consistent with his

stated justifications, which flow logically under his explanation of his beliefs and recollection of the

relevant incidents.

Third, and finally, Plaintiff attempts to make certain factual arguments to prove that she was

not guilty of certain offenses for which she was suspected as the culprit by Borer.  *See, e.g.*, Pl.'s

Opp'n at 24 (pointing to testimony that shows Ms. Palmer actually tampered with Reddin's

computer).  Moreover, Plaintiff claims that (1) "it would have made no sense for Mr. Borer to

terminate Ms. Johnson, a nine year veteran with The Washington Times, based on Ms. Howard's

testimony given that Mr. Borer believed Ms. Howard was untrustworthy and had a motive to lie to

protect herself from appearing as the wrongdoer," Pl.'s Opp'n at 25, and (2) "Ms. Howard has since

recanted her testimony and now denies that Ms. Johnson had given her any documents," instead

claiming once again that they appeared in anonymous package, *id*.  Plaintiff's argument is not

legally cognizable.  The question of whether or not Plaintiff actually committed certain offenses is

not for this Court to determine or consider with respect to pretext; while Plaintiff might feel that her

termination was not just, fair, or sensible given her actual conduct versus Borer's suspicions, such

considerations are insufficient within the Title VII framework.  Rather, Plaintiff must provide

evidence that Borer's stated legitimate, non-discriminatory reasons are actually pretextual and that

race and religion-based discrimination actually occurred.  This is a showing that Plaintiff has not

made.

Ultimately, apart from meeting the rather minimal requirements of the *prima facie* case for discriminatory termination, Plaintiff has provided no evidence – beyond mere baseless speculation – that Borer ever considered her race or religion in his termination decision.  Plaintiff's own speculation and conjecture, absent some affirmative evidentiary proof, is insufficient to defeat summary judgment.  *See, e.g.*, *Steinberg v. Dep't of Justice*, 179 F.R.D. 357, 360 (D.D.C. 1998); *Carter v. Peña*, 14 F. Supp. 2d 1, 7 (D.D.C. 1997) (use of conjecture is particularly inappropriate where plaintiff would bear the burden of proof at trial) (citing *Celotex Corp.*, 477 U.S. at 322-23, 106 S.Ct. 2548); *Campbell-El v. Dist. of Columbia*, 874 F. Supp. 403, 407 (D.D.C. 1994) ("Beliefs are not fact," and a plaintiff – to defeat a motion for summary judgment by a defendant – must provide facts); *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) ("[A] party may not 'rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.'") (citation omitted).  Plaintiff has not shown pretext; rather, Borer's stated reasons are legitimate and non-discriminatory, and his history of sticking to those reasons over time is borne out in the record.  Moreover, absent a showing of pretext, Plaintiff has adduced no other evidence in the recording showing any discriminatory animus or motivation on the part of Borer; she offers no statements by Borer referencing her race or religion, no testimony from others indicating that Borer made reference to or considered those impermissible factors, and no documentary support for her claim.  Indeed, other evidence adduced during discovery shows that during the previous year, 1997, Defendant had terminated a Caucasian employee for a breach of confidentiality somewhat similar to the breaches for which Plaintiff was suspected.  Ultimately, Plaintiff has failed to meet her burden under the *McDonnell Douglas* test:  no reasonable fact-finder could find, based on the evidence presented and inferences due Plaintiff, that she was terminated on October 29, 1998 by The

Washington Times because of her race or religious affiliation. *See Waterhouse*, 298 F.3d at 995

(granting summary judgment because plaintiff's "responses offered no grounds for a rational juror to

conclude that the reason she was fired was racial discrimination rather than poor performance"). As

such, summary judgment in favor of Defendant is appropriate with respect to Counts II, V, and VIII

of Plaintiff's Complaint.

2.     Plaintiff's Retaliation Claims

Counts III, VI, and IX of Plaintiff's Complaint allege that her October 29, 1998 termination

was the result of retaliation against her following her April 24, 1998 EEOC Charge (which was

focused on her salary/raise claim) in violation of the DCHRA, Title VII, and 42 U.S.C. § 1981. *See*

*id*. ¶¶ 21-24 (Count III – DCHRA), ¶¶ 33-36 (Count VI – Title VII), ¶¶ 45-48 (Count IX – Section

1981 Claim).

Title VII not only prohibits federal agencies from discriminating on the basis of race and

gender, 42 U.S.C. § 2000e-16, it also prohibits them from retaliating against employees for the

assertion of their rights under Title VII. *See Forman*, 271 F.3d at 297 (D.C. Cir. 2001). To

establish a *prima facie* case of retaliation, Plaintiff must show that: (1) she engaged in a statutorily

protected activity; (2) the employer took an adverse personnel action; and (3) a causal connection

exists between the protected activity and the adverse action. *See Morgan*, 328 F.3d at 651;

*Holbrook v. Reno*, 196 F.3d 255, 263 (D.C. Cir. 1999). The same test applies under the DCHRA.

*See Arthur Young & Co. v. Sutherland*, 631 A.2d 354, 361 n.17 (D.C. 1993). To prove the

required third element, i.e., a causal connection, Plaintiff must make a "showing that the employer

had knowledge of the employee's protected activity, and that the adverse personnel action took place

shortly after that activity." *Mitchell*, 759 F.2d at 86; *see also Grant v. Bethlehem Steel Corp.*, 622

F.2d 43, 46 (2d Cir. 1980) ("[C]ourts have recognized that proof of causal connection can be

established indirectly by showing that discriminatory activity is followed by discriminatory

treatment."). Causation is often demonstrated by proximity in time, *see Gleklen v. Democratic*

*Congressional Campaign Comm'n, Inc.*, 199 F.3d 1365, 1368 (D.C. Cir. 2000), but can be

negated by evidence discrediting any claim of retaliation, *see Roberts v. Segal Co.*, 125 F. Supp. 2d

545, 550 (D.D.C. 2000); *see also Carter*, 304 F. Supp. 2d at 28). "Once the requisite *prima facie*

showing has been made, the same burden shifting analysis used for discrimination claims applies."

*Dickerson*, 238 F. Supp. 2d at 85 (citing *Singletary v. Dist. of Columbia*, 225 F. Supp. 2d 43, 55-

56 (D.D.C. 2002)).

Here, Plaintiff has met the requirements necessary to establish a *prima facie* case of

retaliation. Plaintiff was engaged in statutorily protected activity through her April 24, 1998 EEOC

Charge, Plaintiff's employer took an adverse action against her in October 1998 by terminating her

employment with The Washington Times, and Borer – the terminating official – learned of this

charge when he received a Notice of Charge of Discrimination from the EEOC, dated April 30,

1998, *see* Pl.'s Opp'n, Ex. 3 (7/10/01 Borer Dep.) at 129:14-130:6, *id.*, Ex. 64 (Notice of Charge

of Discrimination), and participated in Plaintiff's EEO process during the summer of 1998 when he

responded to the EEOC Charge with a preliminary response dated June 5, 1998, *see id.*, Ex. 65

(Washington Times Position Statement to the EEOC Dated 6/5/98), and then with a supplemental

response dated June 22, 1998, *id.*, Ex. 66 (Washington Times Position to the EEOC Dated

6/22/98), *id.*, Ex. 3 (7/10/01 Borer Dep.) at 129:21-129:23.

For the reasons set forth in *supra* Section III(B)(1)(ii), the Court concludes that Defendant

has met its burden of production by offering numerous, significant, and legitimate non-

discriminatory reasons for Plaintiff's termination. Under the *McDonnell Douglas* analysis, the

burden shifts back to Plaintiff to adduce sufficient evidence – using the strength of her *prima facie* case, evidence indicating pretext, and other record evidence – that a reasonable fact-finder could find that retaliatory animus motivated Defendant's decision to discharge Plaintiff.  For the reasons set forth in *supra* Section III(B)(1)(iii), the Court concludes that Plaintiff has failed to show pretext, and no other evidence in the record indicates any retaliatory motivation on the part of Borer or Defendant.  Rather, all evidence indicates that Borer had a good faith belief in his stated neutral, non-discriminatory reasons in firing Plaintiff.  As such, the Court shall grant Defendant's Motion for Summary Judgment with respect to Counts III, VI, and IX of Plaintiff's Complaint.

## IV: CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment is granted in its entirety.  An Order accompanies this Memorandum Opinion.

Date:   March 12, 2006

_____/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge